Shappel et al., Excrs., Appellants, *v.* Philadelphia.

Argued October 5, 1934.

Before TREXLER, P. J., KELLER, CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and JAMES, JJ.

*Michael F. Donnelly,* for appellants.

*Edwin S. Ward,* Assistant City Solicitor, and with him *David J. Smyth,* City Solicitor, for appellee.

OPINION BY KELLER, J., January 4, 1935:

This was an appeal by the City of Philadelphia from an award of viewers in favor of the plaintiffs for $3,278, for damages to their property by the lowering of the grade of Green Lane in the City of Philadelphia. The cut in front of the plaintiffs' property was six and a half feet. After the change of grade, access could be had to the front door of the house, which opened directly on the street, only by a temporary wooden staircase with fifteen steps.

On the trial before the jury, which had viewed the premises, the plaintiffs produced witnesses who testified that the damage done to plaintiffs' property by the change of grade was between $4,850 and $4,880. The witnesses for the City, on the other hand, fixed the damages at from $1,150 to $1,200. C. Edward Hunter, a witness called by the City, who testified that the property was worth $3,100 before the change of grade and $1,900 after, with a consequent damage of $1,200 to the plaintiffs, after he had been examined by the assistant city solicitor, was 'cross-examined' by the court as follows:

"Q. What caused that damage?

A. I would say the property is not as accessible as it was. There are 15 steps that lead up to it now. They are wooden steps at the present time.

Q. How does that hurt the property? Some people build their houses on top of mountains.

A. Yes, I know, but this property before, your Honor, was at practically the grade of the street. It is more inaccessible. It won't rent for as much as it would—at least, that it did if it were at grade. People

don't, in my opinion, pay as much for a house located as close to the street as this is, that has this many steps in one flight. There are instances, naturally, where houses are built on terraces, but they sit back.

Q. Well, along Lincoln Drive, Germantown, aren't there any number of houses—and over in Chestnut Hill—where people built their houses so that you have to approach them by a long flight of steps?

A. They are more modern houses there—of a different type. They are built on terraces—

Q. You mean when people have more money they are willing to walk up steps?

A. No, I wouldn't say that. It is a different type of house. I wouldn't think of comparing the two locations. There aren't any houses in Germantown or Chestnut Hill that are built right out on the building line. This house was built right on the building line.

Q. Do you know of the house of Mr. Smulling, the real estate broker, occupies at 6600 Wayne Avenue?

A. I know of that block.

Q. Built right on the Lincoln Drive?

A. Yes.

Q. You go up a height as much as from the floor to the ceiling to get up to the front lawn.

A. I wouldn't say it is that high.

Q. What I am getting at is why does it damage the market value of a property when you make it necessary to approach it up a flight of steps?

A. Not only that, there is more than the flight of steps. You have to take into consideration the thought that the property—the cellar is above the grade of the street at the present time.

Q. Isn't that a good thing? That keeps water from getting into the cellar, doesn't it?

A. It also makes that cellar more inaccessible to get to for the delivery of coal, and all those different items all enter into it.

Q. Now you are getting to the first thing that impressed me. It is a little troublesome to deliver coal?

A. Yes, all deliveries that go into that basement, as compared to what it was before—anything that you may wish to put into that cellar. In other words, the street level now is below the level of the cellar. I have taken all those things into consideration.

Q. Did you ever live in a house located right along the level of the street?

A. No, I never have.

Q. Did you ever wake up in the night and find your house being shaken by motor trucks?

A. My own house, at the present time I live on the corner, but I am not right on the street.

Q. Did you ever sit in your living room and feel the walls shake and see the clock and different things on the wall rattle, due to the passing of some big motor truck?

A. No, it has never been that way in my house.

Q. Wouldn't it be an advantage to be up above such a street instead of on the level?

A. I think that the same rattling would happen, because your foundations would go down to the street level, and if you are going to get a vibration, it wouldn't make any difference if you are high or low, I think that vibration would travel through the walls just the same.

Q. Wouldn't it go through the soil underneath instead?

A. It would go to the soil and from there to the foundation, into the walls.

Q. But you think that this property was damaged $1,200?

A. Yes, sir, about 40%—I consider this property is depreciated about 40% by reason of this change of grade ......

Q. Mr. Hunter, then all the kings and emperors and

princes who built these houses with enormous pillars and long flights of steps that went up to them, were all wrong, were they?

A. I wouldn't compare the two, your Honor. This is a small house. These large palaces that you speak of are generally surrounded by large acreages. And I will say this from my real estate experiences, that houses that have as many as 15 steps up to them are not in my opinion as salable as those that haven't as many.

Q. What's the matter with the human race, is it becoming soft?

A. Yes, to a great extent. We won't do things that we used to do. We have too many conveniences.

Mr. Donnelly: May I have an exception to your Honor's remarks about the steps and this discussion about the steps not affecting the properties?

The Court: I haven't said the steps didn't affect the property.

Mr. Donnelly: All right, the discussion as to the steps—I would like to have an exception put on the record.

The Court: Surely."

When it is borne in mind that this examination, which suggested very strongly that the plaintiffs had not suffered any substantial damage, was directed not to the witnesses for the plaintiffs, but to a witness for the city, which admitted damages caused by the change of grade of from $1,150 to $1,200, its injurious effect on the plaintiffs is readily seen. It ridiculed the proposition that the lowering of the street had caused the plaintiff's property any substantial injury, and practically eliminated the testimony of *plaintiffs'* witnesses from the consideration of the jury. It was not helped by the reference in the charge that "sometimes the zeal of counsel to win for his client leads him to cast into the jury box the impression that you are

supposed to have a veil over your eyes and a clamp on your brain when you function as members of a jury," nor by the statement in discussing the testimony of the plaintiffs' witnesses. "These two gentlemen say that the market value ...... of that property before the city touched it, was $6000 and after the city dropped this street, *the value of the property dropped even more precipitously than the street*, so that it was worth only $1,150, said Mr. Calvert, and $1,170, said Mr. Tomlinson, making a damage or depreciation in the market value of $4,800 to $4,880, almost 80%—more than 80%."

The verdict was for the amount fixed by the city's witness, with allowance by way of interest.

Our Supreme Court has said on numerous occasions that "A litigant has a right to a trial by a fair and impartial jury whose consideration of his cause is not influenced by any language of the court which would create resentment or prejudice against him": Monier v. Phila. R. T. Co., 227 Pa. 273, 275, 75 A. 1070; Hoagland v. Mulford, 298 Pa. 588, 591, 148 A. 864; Carr v. Mundorf, 311 Pa. 214, 216, 166 A. 789. Where the trend of the charge, or the statements of the court, tend, as a whole, to belittle one of the parties or hold him up to ridicule, the case will be reversed, even though no particular paragraph constitutes reversible error: Weiss v. London Guarantee & Accident Co., 280 Pa. 325, 330, 331, 124 A. 472. The inevitable effect of such belitting statements is to expose the party to ridicule and discredit his testimony: Twinn v. Noble, 270 Pa. 500, 504, 113 A. 686. Jurors catching the tone and temper of their conclusions from such unfair comments fail to give to the facts their true weight, which a fair statement is calculated to produce: Coxe v. Deringer, 82 Pa. 236, 258.

While the foregoing cases were concerned with the effect produced on the jury by an unfair and belittling

charge, the rule is the same as respects the examination of witnesses by the court. In Com. v. Myma, 278 Pa. 505, 123 A. 486, Mr. Justice KEPHART, speaking for the court, said: "The practice of a judge entering into the trial of a case as an advocate is emphatically disapproved. The judge occupies an exalted and dignified position; he is the one person to whom the jury, with rare exceptions, looks for guidance, and from whom the litigants expect absolute impartiality. An expression indicative of favor or condemnation is quickly reflected in the jury box and at the counsel table. To depart from the clear line of duty through questions, expressions or conduct, contravenes the orderly administration of justice. It has a tendency to take from one of the parties the right to a fair and impartial trial, as guaranteed under our system of jurisprudence." In Sarshik v. Fink, 292 Pa. 256, 141 A. 39, the Supreme Court granted a new trial because of the severe cross-examination of the defendant by the trial judge, where it was of the opinion that the defendant had no chance thereafter with the jury, even though the judge endeavored to correct the matter in his charge. And in Marcu v. Gottlieb, 302 Pa. 398, 153 A. 719, where the trial judge examined the plaintiffs' witnesses in a tone and manner deprecatory to them, the Chief Justice, in reversing the judgment and granting a new trial, said "For a trial judge deliberately to take sides in a controversy and by his remarks and general manner to discredit a suitor's case in the eyes of the jury......should not be acquiesced in by this court."

We are of opinion that after the trial judge had finished his cross-examination of the defendant's witness, Hunter, the plaintiffs had no chance of receiving at the hands of the jury the fair and unbiased consideration of the evidence produced on their behalf to which they were entitled, and that nothing in the charge

536

entirely eliminated the injurious effect of his cross-examination.

The trial judge, in his opinion refusing a new trial admitted that, "read in print, the examination conducted by us of the witness, Hunter, seems at first an unwarrantable interference with counsel in the trial of the case," but he justified the action by his desire to prevent an exaggerated verdict against the city and by his belief that the verdict rendered was adequate and just.

The court, in a civil action, can always control an excessive verdict by the grant of a new trial; it should not attempt to influence the jury's verdict by belittling the evidence of either party.

We are not satisfied that the plaintiffs in this case had the fair and impartial trial to which they were entitled, and hence sustain the first additional assignment of error.

The judgment is reversed and a new trial awarded.