Duffy, (et al., Appellant), *v.* Griffith et al.

Argued September 28, 1938.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

448

*Ralph B. Umsted,* with him *John R. Umsted,* for appellant.

*Raymond A. White, Jr.,* with him *Todd Daniel,* for appellee.

OPINION BY RHODES, J., January 31, 1939:

The atmosphere which pervaded the trial of this case was so prejudicial to the right of plaintiff to a fair and impartial trial as to require the granting of a new trial. The attitude of the trial judge calls for a new trial. See *Commonwealth v. Myma,* 278 Pa. 505, 123 A. 486; *Sarshik v. Fink,* 292 Pa. 256, 262, 141 A. 39.

Catherine B. Duffy, by her next friend and mother Catherine Duffy, and Catherine Duffy brought an action in trespass against Frank Griffith. J. N. Rosenberger was brought in as an additional defendant. The jury rendered a verdict in favor of Catherine B. Duffy in the amount of $25, and a verdict in favor of Catherine Duffy in the amount of $275, against both defendants. Plaintiffs filed a motion for a new trial, which was refused. Catherine Duffy appealed.

Appellant sustained injuries as the result of an automobile accident, for which, it is admitted in the briefs, neither appellant nor her daughter was responsible. At the trial the defense sought to minimize the extent and seriousness of appellant's injuries. The attitude of the trial judge not only tended to minimize plaintiff's injuries, but placed appellant and her counsel in an unfavorable light with the jury. The record is replete with incidents where the trial judge, by re-

marks or by the examination of witnesses, produced a situation which was not conducive to a fair and impartial trial, and the jury in arriving at a verdict could not, in our opinion, have failed to have been unfavorably influenced by such conduct.

It is fundamental that a litigant has a right to a fair and impartial trial and to a calm and unbiased consideration of his case by the jury. See *Monier v. Philadelphia Rapid Transit Co.*, 227 Pa. 273, 75 A. 1070; *Hoagland v. Mulford*, 298 Pa. 588, 148 A. 864; *Carr v. Mundorf*, 311 Pa. 214, 166 A. 789; *Shappel et al. v. Philadelphia*, 115 Pa. Superior Ct. 529, 176 A. 69. Where the trial judge, by his questions, remarks, or general attitude, prevents the fair and unbiased consideration by the jury of the evidence of one of the parties, to which he was entitled, reversible error has been committed, and a new trial should be granted. See *Commonwealth v. Myma,* supra; *Sarshik v. Fink,* supra; *Marcu et ux. v. Gottlieb,* 302 Pa. 398, 153 A. 719. Our examination of the record discloses that the trial judge went beyond reasonable limits in the examination of witnesses, made remarks and improper rulings which were prejudicial to appellant, and assumed an attitude that could not be construed as other than hostile to appellant's cause. A recital of some of the examination of witnesses by the trial judge, and of some of his remarks and rulings is sufficient to disclose that the conduct of the trial judge unmistakably calls for another trial. The trial judge frequently interrupted the examination of appellant's witness Dr. Edward F. McLaughlin to question him. The witness was testifying as to the condition of appellant before the accident when the trial judge interrupted: "Q. A little worse after the accident than they were before? A. Sir? Q. The accident aggravated that condition at that time a little? A. I think it did." The witness had said nothing about "little" before these questions by the trial judge. And again the court asked of this

witness: "The Court: What is the nervous condition? What is the matter with her, Doctor? Is she just nervous or has she got anything you can give a name to, any disease? The Witness: I don't think it can be completely pinned down with a definite name. As near as I can describe it, in plain terms, it would be a chronic St. Vitus' Dance [at time of trial]. The Court: Does that make her jerk and twitch? The Witness. Yes. Q. She had it before the accident and the accident increased it? A. I believe it did. Q. It is better now? A. It has improved some. Q. Would you say it has improved to the point where it isn't any worse than it was before the accident? A. Well, I only saw her one time before the accident. Q. It isn't very bad now, is it? A. It isn't terribly bad, no, but very definitely present." The jurors from such examination must have observed that the trial judge sought to minimize the extent and seriousness of appellant's injuries resulting from the accident. The examination of every witness by the trial judge was so extensive that in itself it was indicative of a lack of absolute impartiality.

From the record it plainly appears that the trial judge largely superseded counsel. The trial judge questioned appellant in part as follows: "By the Court: Q. Mrs. Duffy answer me this: Doctor McLaughlin says these cuts and things got all right in the normal time; they didn't bother you very long; it was your nerves that kept you upset. Is that in accordance with your own idea of the case? A. Well, it got well but my head is still bothering. Q. I understand. A. Every week I haven't been without pain a week, my head, the side of my head. Q. That doesn't come from the cut in the head? A. I believe it does. Mr. White: I ask that it be stricken out. The Court: We will let it in for what it is worth. I will give the defendant an exception. ...... The Court: There isn't any evidence of any scars as yet. The Witness: I guess they

are all healed up. Of course, I just couldn't say how long—By Mr. Umsted: Q. Are they healed now? A. They are healed, now. By the Court: Q. They were healed within two weeks from the accident, according to the doctor? A. It was more pain I had in my head than anything else."

The trial judge precluded the calling of other witnesses who were available to testify as to the condition of appellant before the accident. In the direct examination of Mary D. Fletcher, witness for plaintiffs, the following appears: "By Mr. Umsted: Q. Did you pay any notice to her physical nervous conditions, those symptoms, those things that were apparent before July 13, 1934? Mr. White: That is objected to. The Court: Why have the same thing over and over again? Mr. Umsted: I am showing this woman was in good condition before. The Court: You have that on the record. Mr. Umsted: I want to verify it. I want the jury to know it is true. The Court: You can have Mrs. Fletcher testify, but you can't keep on calling people one after another to say the same thing. Mr. Umsted: I have other witnesses but I will offer Mrs. Fletcher and no more. The Court: Well, examine her."

We recognize that it is within judicial discretion to limit the number of witnesses on a particular phase of the case, and that it is not aiding the administration of the law to multiply the proof, after a reasonable number has been called. See *Commonwealth v. Gibbons and Rosenberry*, 3 Pa. Superior Ct. 408, 413. In the instant case appellant's condition before the accident was a vital question. With the exception of Dr. McLaughlin no entirely disinterested witness had testified for plaintiffs. He had seen appellant one time in 1932, and the first time thereafter on July 17, 1934, the accident having occurred on July 13th. It is obvious that, with only such testimony before the jury, the exclusion of further testimony as to appellant's condition

before the accident was injurious to appellant. Appellant should not have been prevented from giving additional, confirmatory, cumulative, and corroborative evidence of the facts which she had previously proved, and which would have tended to strengthen, add force and probability to such evidence. See *Myre v. Ludwig*, 1 Pa. 47, 54.

On behalf of the defense, Dr. A. M. Ornsteen, a medical expert, was called, having made an examination of appellant on January 8, 1936; the accident having taken place on July 13, 1934, and the trial on October 7, 1936. The day of the examination was the first that this witness had seen appellant. The trial judge proceeded to question the witness as follows: "By the Court: Q. Doctor, you knew when you went there, why you went, didn't you? A. Yes, sir. Q. There was a claim that the nervous condition of this lady was the result of an automobile accident? A. Yes, sir. Q. Didn't you? A. Yes, sir. Q. That is what the defendant's lawyer sent you there for, to find out whether it was or not; is that so? A. Yes, sir. Q. Did you confer with this lady's doctor or wasn't he there? A. He wasn't there. I heard his testimony yesterday for the first time. Q. Was Mr. Umsted there? A. Yes, sir. Q. Did Mrs. Duffy give you an account of the way in which she was hurt? A. Yes, I have a detailed account of the accident and the course of her condition from that time on. Q. So you had all the matters that have been testified to here before you; is that correct? A. Yes, sir. Q. I mean, with regard to her condition? A. Yes, took that into consideration. Q. Her doctor said yesterday she had St. Vitus' Dance before this accident; did you find anything to indicate that? Mr. Umsted: I object to that question, if your Honor please, because I don't think it accurately portrays—The Court: I am examining the witness. Mr. Umsted: An exception. The Court: Very well. (Exception noted for the plaintiffs.) The

Witness: No, sir, this is not St. Vitus' Dance in any form, and such a diagnosis is excusable, when made by a general practitioner because—By the Court: Q. It is like it, that is the twitching is something like it? A. Yes, there is movement, but not that kind of movement that is seen in St. Vitus' Dance. Q. This nervous condition that she has, you think, is due to some organic changes in the nerve cells and not due to any injury got in this accident; is that the effect of your testimony? A. Yes, sir, because her symptoms are not functional, but are due to a very definite disorder of the central nervous system. ...... By the Court: Q. Was there anything from the history of this case or your examination that would lead you to ascribe this condition from which she now suffers to any injuries sustained in this accident? A. No, sir. Q. Did the kind of injuries she said she had and you found, indicate to you, from your examination and consideration of the case that, whatever condition she had before was aggravated so that she is worse, as to her nervous condition, as a result of this accident than she was before? Do you understand what I mean? A. Yes, sir. No aggravation of this disorder, which I found, except for a temporary increase of symptoms during the acute reaction of the trauma that is characteristic even of organic diseases. Q. But after she got over the cuts and had the stitches taken out, were there any bad effects from it, with regard to this trembling that she has today? A. No, sir; I don't believe that disease would be aggravated by such injuries."

On the cross-examination of this medical expert by counsel for appellant the record discloses the following: "By Mr. Umsted: Q. Your examination was made in 1936, in January? A. January 8, 1936. Q. Doctor, you were brought here at the instance of Mr. White— The Court: Strike it out. Of course he has. He has been asked that already and he said yes. Mr. Umsted:

And I am asking permission to ask the witness a question as to how much he is being paid for coming here to testify. The Court: That is none of your affair. If it wasn't that we are so far advanced in the case I would withdraw a juror. That is highly improper to say or even suggest. Mr. Umsted: If your Honor please—The Court: If it wasn't for the expense involved in trying this case over again I would withdraw a juror. I shall instruct the Jury to disregard what you said. Mr. Umsted: May I see your Honor at side bar with Mr. White? The Court: No. If you have anything to say, make a motion. Mr. Umsted: Merely to say to your Honor that this other question was ruled proper in the Court of Common Pleas No. 2. The Court: That may be. I suppose there was some basis for it. You admitted this doctor's qualifications as an expert to come here and testify. Mr. Umsted: Yes, sir. The Court: If you wanted to attack his reputation you should have done it then. You cannot do it in this improper, unethical way. If you want to ask anything about his notes all right; if you don't, we will let the doctor go."

The question directed to this witness did not constitute an attack on his reputation, nor was the question improper or unethical. It was competent. "Whatever tends to show the interest or feeling of a witness in a cause is competent by way of cross-examination": *Commonwealth v. Farrel*, 187 Pa. 408, at page 423, 41 A. 382. The attitude of the trial judge created an impression which the jury would naturally reflect. In *Shannon v. Castner*, 21 Pa. Superior Ct. 294, at page 322, this court, in an opinion by President Judge RICE, said: "The fact that an expert witness is to receive, or has received, per diem compensation beyond the legal witness fee does not affect his competency as a witness, and it may have very slight bearing upon the question of his impartiality. Nevertheless, his relation to the party calling him may be such as to warrant the jury

in taking it into consideration in weighing his testimony."

It was not proper for the trial judge to refuse to permit inquiry within reasonable limits as to the amount of the witness' compensation for testifying for the defense as a medical expert. "It may be shown, as bearing on the credibility of a witness and the care with which his evidence should be considered, that he has been paid an amount in excess of the regular witness fees. ...... While the testimony of an expert whose relations to the case are purely professional should not be discredited merely because he received compensation for such testimony, yet the credibility of such a witness is affected by the fact that he was employed and paid by one of the parties for the purpose of investigating and examining into questions of physical or mental condition, etc., for the purpose of testifying with respect thereto": 70 C. J. §1158, pp. 954, 955.

As this court said in *Shappel et al. v. Philadelphia,* supra, 115 Pa. Superior Ct. 529, at page 536, 176 A. 69, at page 72, in an opinion by the present President Judge: "The court, in a civil action, can always control an excessive verdict by the grant of a new trial; it should not attempt to influence the jury's verdict by belittling the evidence of either party." Moreover, a trial judge should not usurp the functions of counsel and witnesses, but should adhere to his judicial duties as established under our system of jurisprudence.

The verdict of the jury may well have been influenced by the partiality and passion of the trial judge. Regardless of the result of another trial, a new trial is necessary in order that appellant may have, what in our judgment she has been denied, a fair and impartial trial. We are not unmindful that appellant made no motion for the withdrawal of a juror (*Mackin v. Patterson,* 270 Pa. 107, 112 A. 738), and that an exception was not taken to every alleged prejudicial remark or erroneous ruling of the trial judge (*Pennsylvania Rail-*

*road Co. v. City of Reading,* 249 Pa. 19, 94 A. 445), or to the extensive examination of every witness; but the extended examination of witnesses, and the general attitude of the trial judge discernible from the printed record, are alone sufficient to require a new trial.

Appellant's assignment of error is sustained.

Judgment is reversed, and a new trial awarded.