564 A.2d 209

**Robert A. SMITH, Appellee,**

**v.**

**CELOTEX CORPORATION, Eagle–Picher Industries, Inc., GAF Corporation, Johns–Manville Sales Corporation, Keene Corporation, Owens–Corning Fiberglass Co., Inc., Certainteed Products Corporation, Pacor, Inc., Appellees.**

**Appeal of GAF CORPORATION.**

Superior Court of Pennsylvania.

Argued Dec. 6, 1988.

Filed Aug. 30, 1989.

H. Nathaniel Metz, Philadelphia, for GAF Corp., appellant.

Robert E. Paul, Philadelphia, for Smith, appellee.

Before CIRILLO, President Judge, and BECK and KELLY, JJ.

BECK, Judge:

This is an appeal by GAF Corporation from a judgment against it after a jury trial of appellee Robert A. Smith's personal injury claims.[1] Smith was employed as an applicator of finished asbestos products, including pipe covering products, at least one of which was manufactured by GAF. He instituted suit against GAF and several other asbestos manufacturing defendants on February 19, 1980. A jury trial was conducted from January 21, 1986 to February 13, 1986. Trial was had in reverse bifurcated procedure. The first phase adjudicated medical causation and compensatory damages issues, and the second phase adjudicated liability and punitive damages issues. The jury awarded $500,000 in compensatory damages and, as to GAF, $20,000 in punitive damages.[2] The trial court thereafter molded the verdict to assess $83,333.33 in compensatory damages against GAF, $20,000 in punitive damages against GAF, and $49,885.84 in delay damages against GAF.

GAF appeals all three of these awards. It raises the following issues:

1. Whether the documentary evidence and deposition testimony offered by the plaintiff was admissible against GAF, and if so, whether it was legally sufficient to support an award of punitive damages?

2. Whether the trial court adequately instructed the jury regarding punitive damages?

3. Whether the plaintiff sustained his burden of proof to establish at trial that GAF is subject to punitive damages for the acts and/or omissions of The Ruberoid Co.?

1. Initially we dispose of appellee's motion to quash this appeal based on certain deficiencies in appellant's brief, which was originally filed prior to argument. The motion was denied, but appellant was ordered to correct the deficiencies. Appellant then supplemented its brief, but the motion to quash was thereafter renewed. We find that appellant's brief, as amended, is in substantial compliance with the Rules of Appellate Procedure and, therefore, will consider the appeal on its merits.

2. Punitive damages were also awarded in the amount of $100,000 against each of the other defendants who had previously settled with plaintiff. The punitive damages awards against them were then vacated by order of the trial court dated February 14, 1986.

4. Whether the trial court erred in allowing cross-examination of the defendants' medical expert with regard to past patient referrals by attorneys and fees earned from such referrals?

5. Whether the compensatory award can stand where the trial court allowed the plaintiff to argue a lost wages claim and then excluded the claim as a matter of law without any instructions to the jury?

6. Whether the trial court's order to mold the verdict is premature until the releases provided to the settled tort-feasors are produced and reviewed?

7. Whether the award of delay damages is appropriate in the context of this case?

We agree with appellant's position as to issues 1 and 5 and, therefore, grant judgment N.O.V. to appellant as to punitive damages and remand for a new trial as to compensatory damages. This disposition obviates the need for us to opine on GAF's claims of error as to the award of delay damages and as to the trial court's molding of the verdict.[3]

▮ Appellant's first three issues and the bulk of its argument focus on the propriety of the punitive damages award of $20,000. We find that the evidence regarding punitive damages offered against appellant was legally insufficient to permit an award of such damages.

It has long been the law of Pennsylvania that punitive damages are appropriate only in the most circumscribed situations. Section 908 of the Restatement (Second) of Torts, which has been adopted in Pennsylvania, sets forth the governing principles for awards of punitive damages:

3. The award of delay damages must be reconsidered after the new trial on compensatory damages is complete. The propriety and amount of delay damages should then be determined in accordance with new Rule of Civil Procedure 238, effective November 7, 1988. Obviously the molding of the verdict must also await completion of the new damages trial. For the guidance of the trial court, however, we note that the recent decision of a panel of this court in *Walton v. Avco Corp.*, 383 Pa.Super. 518, 557 A.2d 372 (1989), highlights the importance of close examination of the releases exchanged between the plaintiff and settling defendants in determining the rights and liabilities of non-settling defendants like the appellant here.

> Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

Restatement (Second) of Torts, Section 908(2) (1965). *See also Rizzo v. Haines,* 520 Pa. 484, 555 A.2d 58, 69 (1989); *Kirkbride v. Lisbon Contractors, Inc.,* 521 Pa. 97, 555 A.2d 800 (1989); *Martin v. Johns Manville Corp.,* 508 Pa. 154, 168, 494 A.2d 1088, 1096 (1985) (plurality); *Chambers v. Montgomery,* 411 Pa. 339, 344, 192 A.2d 355, 358 (1963).

The reckless disregard of the rights of others that is required under Section 908 is further explained by Section 500 of the Restatement, which defines "reckless disregard" as follows:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

Restatement (Second) of Torts, Section 500 (1965).

Thus, as the Supreme Court opined in *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742 (1984), in determining whether punitive damages should be awarded, "[t]he state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." *Id.,* 506 Pa. at 396, 485 A.2d at 748. *See also Rizzo v. Haines, supra: Thomas v. American Cytoscope Makers, Inc.,* 414 F.Supp. 255 (E.D. Pa.1976); *Neal v. Carey Canadian Mines, Ltd.,* 548 F.Supp. 357, 374 (E.D.Pa.1982). This focus is unquestionably proper, since the purpose of punitive damages is to punish the defendant's conduct and deter similar behavior

in future. *See Kirkbride, supra;* Restatement (Second) Torts, Section 908(1). Where the defendant has acted in a merely negligent manner, or even a grossly negligent manner, there is insufficient culpability and awareness by the defendant of the nature of his acts and of their potential results either to warrant punishment or effectively to deter similar future behavior.

These principles have recently been applied by the Supreme Court in the specific context of an award of punitive damages in a suit brought by an applier of finished asbestos products against a manufacturer of such products. In *Martin v. Johns–Manville Corp., supra,* the Supreme Court held that plaintiff, an applier of finished asbestos products, had failed to produce sufficient evidence of the outrageous conduct by the defendants, manufacturers of the asbestos products, to warrant submission of the issue of punitive damages to the jury. Plaintiff had alleged that the outrageous conduct of defendants consisted in not affixing warnings to their products until 1964. Although the lead opinion in *Martin* was a plurality of two justices, all of the remaining four justices who participated concurred in the result that the punitive damages award should be stricken.

The evidence deemed insufficient in *Martin* was testimony by two doctors concerning what the medical profession knew of the risks posed to appliers of finished asbestos products and when they knew it. One doctor testified that he first became aware of these risks in 1964. Another doctor, who had been employed as a consultant by one of the defendants from 1962 to 1963, testified that he advised that defendant in 1963 that appliers were at some, albeit minimal, risk from asbestos exposure. He testified that although he had no knowledge of medical reports regarding asbestos related risks posed to appliers prior to 1962–1963, he testified that such risks had been established by then through clinical observations by appliers' physicians.

In *Martin,* Justice Hutchinson (author of the lead opinion) emphasized that plaintiff had not produced sufficient evidence of the awareness of the defendants of the specific

risks associated with application of finished asbestos products, as opposed to risks associated with the manufacture of asbestos products. Justice Hutchinson distinguished those cases where the plaintiffs were employees of manufacturers of asbestos products and produced evidence of the specific knowledge of the defendants as to the risks posed to manufacturing employees such as the plaintiffs long before the defendants took any measures to protect the employees. *See, e.g., Neal v. Carey Canadian Mines, Inc., supra. See also Catasaugua Area School District v. Raymark Industries, Inc.,* 662 F.Supp. 64, 70-1 (E.D.Pa. 1987) (evidence on punitive damages insufficient where it failed to show any awareness by defendant of risks associated specifically with installation of finished asbestos products in schools).

An analysis of the evidence adduced by plaintiff in the instant case forces us to the same conclusion as was reached in *Martin.* Here, the evidence submitted equally did not establish either that the management of appellant knew or had reason to know of facts indicating that appellant's conduct posed a substantial risk of physical harm to an applier of finished products like plaintiff.

The evidence as to punitive damages may be briefly summarized as follows:

1. Deposition testimony of Dr. Katherine Sturgis regarding a historical survey of medical articles concerning the risks of exposure to asbestos beginning in the early part of the century.

2. Deposition testimony of Mr. Limerick, manager of one of appellant's predecessor's asbestos mines from 1937–1945 and thereafter Chief Engineer and then Vice President of Manufacture of Building Products Division—testimony indicated that while at the mine, Limerick had never heard of "asbestosis" but he had heard of asbestos "causing some difficulties" and that "some people were having breathing problems".

3. Deposition testimony of Mr. Sarlo, who began as a machine laborer at an asbestos manufacturing plant

owned by appellant's predecessor and who, by the early fifties, became a production superintendent and then plant manager for the manufacture of asbestos products—testimony that he was unclear as to when he first became aware, although it was possibly in the early fifties, that if one breathed in asbestos one was "in trouble with asbestosis and it could cause lung cancer and that kind of thing."

4. Evidence of answers to interrogatories filed by appellant in unrelated litigation indicating that in the early 1950's appellant's predecessor had received two workers' compensation claims by manufacturing employees in which the employees alleged that they had asbestos related disease.

As to the testimony of Dr. Sturgis, we note that none of her testimony related to knowledge specifically held by appellant. The testimony contains no references to appellant. Nor did plaintiff produce other evidence of appellant's specific knowledge of the medical articles to which Dr. Sturgis referred or to any membership by appellant in any association that customarily collected and sent to its members such articles. In addition, the whole of Dr. Sturgis' testimony related to medical knowledge generally relating to risks to "asbestos workers" and to the risks of inhaling asbestos dust. There is no testimony specifically relating to knowledge by the medical profession as to the risks posed by finished asbestos products to those who installed or applied them. We, therefore, conclude that Dr. Sturgis offered no testimony in any way probative of outrageous conduct by appellant vis-a-vis plaintiff.

We reach a similar conclusion as to the last of the above enumerated categories of evidence, i.e. the workers' compensation claims submitted to appellant in the early fifties. The existence of these claims alone, with no evidence demonstrating anything relating to how they were ultimately resolved, does not indicate anything regarding appellant's knowledge of the risks posed to appliers of asbestos products for numerous reasons. Most importantly, we note that

the claimants were manufacturing employees and not appliers. Thus, we do not see how the mere fact that these workers' compensation claims were made is relevant to plaintiff's punitive damages claim.

Finally, we must assess the impact of the generalized statements by two former employees of appellant's predecessor regarding their knowledge of the risks associated with asbestos. Once again, neither of these employees were involved in applying finished asbestos products, nor did either testify that they were otherwise aware of the risks involved in such activity. Mr. Limerick was exclusively employed in the mining aspect of asbestos production when he acquired his generalized knowledge of certain "difficulties" asbestos might pose. Mr. Sarlo was equally not involved in the application of finished products, but rather testified only that while he was involved in the manufacture of asbestos products he acquired knowledge of the risks associated with inhaling asbestos.

We fail to see how these slim and generalized references by two former employees engaged solely in mining and manufacturing, neither one of which had responsibility for medical or health matters, could form the basis for a reasonable jury to conclude that the management of appellant knew or had reason to know long before it placed warnings on its products that the activity of applying those products posed a substantial risk of physical harm to the appliers and yet acted with reckless indifference to that obvious and substantial risk.

The punitive damages award must be reversed.

 Appellant next argues that a new trial regarding the medical causation of plaintiff's injuries must be had because of the trial court's error in allowing broad cross-examination of one of appellant's medical expert witnesses regarding his prior testimony on behalf of other asbestos companies and the fees he earned therefrom. Appellant contends that the court violated the rule of *Mohn v. Hahnemann Medical College and Hospital,* 357 Pa.Super. 173, 515 A.2d 920 (1986), in permitting this testimony and, more-

over, was not evenhanded in its treatment of appellant when its counsel cross-examined appellee's expert witness as to the same subject.

A new trial may be granted if the trial court abused its discretion or committed an error of law which controlled the outcome of the case. *Allison v. Snelling & Snelling, Inc.,* 425 Pa. 519, 521, 229 A.2d 861, 862 (1967); *Foley v. Clark Equipment Co.,* 361 Pa.Super. 599, 523 A.2d 379 (1987).

We agree with appellant to the extent that it points out a slight disparity in the treatment by the trial court of the parties' expert witnesses. The court sua sponte interrupted appellant's cross-examination of plaintiff's expert when appellant was eliciting information about the expert's services and fees for other lawyers representing the plaintiff in litigation and prohibited further examination on that point. However, the court did not recall that ruling when appellant's own expert witness was testifying and the court allowed slightly more detailed cross-examination as to that expert's other services and fees for other asbestos defendants.

Although we disapprove strongly of conflicting rulings by a trial court as to the scope of cross-examination depending on which party is conducting it, we do not see the disparity between the testimony elicited on this point as being nearly great enough to merit a new trial due to this error. Both expert witnesses did testify as to their involvement in other matters and were examined in an attempt to reveal their bias in favor of plaintiffs or defendants, including the approximate amount they received as fees for their services. Thus, we will not reverse on the ground of unequal treatment.

█ We also do not view the trial court's allowance of the cross-examination of appellant's expert witness as having gone beyond the bounds of the rule governing cross-examination of expert witnesses regarding possible bias in favor of the party calling them. In *Grutski v. Kline,* 352 Pa. 401, 43 A.2d 142 (1945), the Supreme Court established that impeachment of an expert witness by demonstrating

partiality to the party for whom the expert is testifying is permissible. The Court stated:

> Whatever tends to show the interest or feeling of a witness in a cause is competent by way of cross-examination.... The fact that an expert witness is to receive, or has received, per diem compensation beyond the legal witness fee does not affect his competency as a witness, and it may have very slight bearing upon the question of his impartiality. Nevertheless, his relation to the party calling him may be such as to warrant the jury in taking it into consideration in weighing his testimony.

*Id.*, 352 Pa. at 406, 43 A.2d at 144 (quoting *Duffy v. Griffith*, 134 Pa.Super. 447, 4 A.2d 170 (1939). Thus, it is proper to elicit from an expert the fee he is being paid to testify. *Accord Zamsky v. Public Parking Authority of Pittsburgh*, 378 Pa. 38, 105 A.2d 335 (1954). Later decisions have further indicated that it is also proper to elicit whether a personal friendship exists between the expert and either the party calling him or that party's counsel. *Downey v. Weston*, 451 Pa. 259, 301 A.2d 635 (1973). In any event, the precise degree to which such impeachment cross-examination will be permitted rests in the sound discretion of the trial court. *Commonwealth v. Lane*, 492 Pa. 544, 424 A.2d 1325 (1981); *Downey v. Weston, supra.*

Appellant argues, however, that one limitation on the scope of such cross-examination was established in *Mohn v. Hahnemann Medical College and Hospital*, 357 Pa.Super. 173, 515 A.2d 920 (1986), and that this limitation was violated in this case. In *Mohn*, an expert witness for the defendant, Dr. Urbach, was cross-examined regarding various ledgers he maintained indicating his involvement in numerous activities and his payment therefor. The ledgers contained information spanning a five year period and related not only to cases where the expert had testified, but also to cases where he had examined or treated a patient and then been paid by a lawyer or private or public agency for whatever reason. Despite the breadth of these records, largely unrelated to the case before the court, the trial

court allowed the admission into evidence of the income the ledgers revealed.

This court reversed, stating:

No one disputes that [the Supreme Court] approves of cross-examining an expert as to the amount of his compensation for testifying in the case on trial. This same thinking has been extended to permit inquiry into a physicians personal friendship with a party to a suit or a party's attorney so as to expose his interest in or bias towards either side of the lawsuit. In this regard, we find proper the trial court's allowance of the plaintiff's query about the existence of the financial relationship between Dr. Urbach and defense counsel's firm, which spans approximately twelve (12) years and is still extant as evidenced by some thirty (30) cases in which the two are still actively involved.

We do not believe, however, that the case law in this jurisdiction would condone the type of extensive disclosure of an expert's fee generating cases, especially since they were not related to the case at bar (except tangentially).... There must be, and is, a point beyond which inquiry is/will be held to be prejudicial, too intrusive and only serving to divert the case into collateral matters.

. . . .

... we do not think [the permissible scope of inquiry] encompasses the emptying of one's pockets and turning them inside out so that one's financial worth can be open to scrutiny.

*Mohn,* 357 Pa.Super. at 178, 181, 515 A.2d at 923, 924.

We do not regard the degree to which the trial judge permitted cross-examination of appellant's expert as having gone beyond the limitation expressed in *Mohn,* nor do we view it as an abuse of the trial court's broad discretion in such matters. In contrast to the breadth of disclosure disallowed in *Mohn,* where the expert's entire financial picture was displayed to the jury, in the instant case appellant's witness was only asked regarding his specific involve-

ment in asbestos cases on behalf of the defendants therein and the fees generated from them. This information may be perceived as at least somewhat relevant to whether this expert was biased or prejudiced in favor of asbestos defendants and is unlike the information elicited in *Mohn,* which was totally irrelevant to showing such bias or prejudice.

We also reiterate that appellee's expert witness had also previously been allowed to testify (to a somewhat lesser degree) as to his involvement with rendering reports on behalf of law firms representing plaintiffs other than the firm representing plaintiff herein and as to his compensation for those services. Although both lines of questioning were perhaps slightly beyond the proper scope, and elicited to some degree information not directly relevant to the interest of the witness in the case at hand, we find that they counterbalance each other and resulted in no reversible error.[4]

Appellant next argues that a new trial regarding compensatory damages is required due to prejudicial error in the trial court's charge. The error relates to the court's description of the allowable damages the jury could award and focuses on appellee's claim for lost wages. The pertinent facts are as follows.

The trial court allowed testimony regarding appellee's lost wages allegedly as a result of his asbestos related injuries and further allowed plaintiff's counsel to argue that lost wages should be awarded in his closing argument. Thereafter, however, after the charge to the jury and out of the jury's presence, the trial court determined that the lost wages claim could not be submitted to the jury and should be excluded since the evidence thereof was insufficient. The court refused, however, to grant a directed verdict to appellant on this claim or to give clarifying instructions to the jury. The court reasoned that its charge had merely

4. We also reject appellant's allegation of error as to the trial court's permitting cross-examination of appellant's expert regarding his involvement with the New Jersey Chemical Association. We find no prejudicial error in this ruling.

instructed the jury to award damages for appellee's pain and suffering, loss of life's pleasures, embarrassment and humiliation and had not specifically mentioned lost wages. Thus, the court concluded that no clarifying instruction was necessary.

We disagree. We recognize that in reviewing a jury charge we must accord the trial court wide latitude in conveying the law to the jury. *Reilly by Reilly v. SEPTA*, 507 Pa. 204, 489 A.2d 1291 (1985). We must also read the charge in its entirety to determine whether any prejudicial error has occurred. *Riddle Memorial Hospital v. Dohan*, 504 Pa. 571, 576, 475 A.2d 1314, 1316 (1984). However, we must also remain mindful that where a jury charge, when read as a whole, may well have misled or confused the jury in a manner prejudicial to the complaining party, we must reverse. *Hawthorne v. Dravo Corp., Keystone Div.*, 352 Pa.Super. 359, 508 A.2d 298 (1986). This is such a situation. This jury heard testimony regarding lost wages and closing argument directed specifically to that point. Shortly thereafter, they received a charge from the trial court that made reference to the general items of damage they might award and that never mentioned anything about lost wages. Thereafter, the trial court changed its mind and excluded this claim but refused to inform the jury of that decision.

Clearly, this jury could well have assumed and, indeed, was impliedly allowed to assume, that the lost wages claim was part of this case. They could have considered lost wages as one element by which they could compensate plaintiff for his pain and suffering or, even more likely, could have regarded the loss of the ability to work as one element of the loss of life's pleasures. We cannot say with any degree of certainty that this jury somehow gleaned from the court's charge that the evidence and argument regarding lost wages should now be given no consideration.

The trial court's refusal to direct the jury that they should ignore all they had heard as to lost wages and specifically exclude any such item of damage from their

354

consideration was reversible error. Thus, a new trial without evidence of lost wages is required.

The judgment as to punitive damages is reversed.

The judgment as to compensatory damages is reversed and the matter is remanded for a new trial as to compensatory damages alone.

The judgment is affirmed as to liability and medical causation.