515 A.2d 920

**Harry B. MOHN and Helen Mohn**

v.

**HAHNEMANN MEDICAL COLLEGE AND HOSPITAL OF PHILADELPHIA, Appellant.**

Superior Court of Pennsylvania.

Argued April 8, 1986.

Filed Aug. 25, 1986.

Reargument Denied Oct. 14, 1986.

David P. Bruton, Philadelphia, for appellant.

Marshall A. Berstein, Philadelphia, for appellees.

Before BECK, POPOVICH and HOFFMAN, JJ.

POPOVICH, Judge: ∙

This is an appeal from a four-million dollar judgment entered against Hahnemann Medical College and Hospital of Philadelphia. We reverse.

We are asked by Hahnemann to review the denial of its motion for a new trial. In doing so, we must decide whether there was an abuse of discretion or error of law committed by the trial court which controlled the outcome of the case. *Allison v. Snelling & Snelling, Inc.*, 425 Pa. 519, 229 A.2d 861 (1967).

So viewed, the evidence reveals that Harry B. Mohn admitted himself to Hahnemann Hospital, upon the advice of his physician, for the evaluation of certain neurological problems. Tests were conducted and indicated that he was suffering from cervical spondylosis, an arthritic condition of the neck. In an attempt to stabilize his condition and prevent the progression of his arthritis, surgery was performed.

No one disputes that the services performed by the hospital before, during and after the operation, up to a point, were medically proper. The matter in dispute concerns the medical care provided to Mohn between 2:00 a.m. and 6:30 a.m. on the 11th of May, 1973. During this period, Mohn was in the hospital's intensive care unit following surgery, and, sometime between 6:00–7:00 a.m., he suffered a "respiratory arrest". He was resuscitated after an emergency code call, but became quadriplegic (paralyzed in all four limbs) immediately subsequent to the respiratory attack. Thereafter, he improved somewhat to his present, permanent condition diagnosed as quadriparesis (weakness in all limbs). Also, Mohn sustained a visual impairment which inhibits his vision to the area above an imaginary

equator across his eyes. Further, Mohn contracted speaking and swallowing problems, a condition related to his pseudo-bulbar (muscular control) palsy, from the arrest and the efforts to resuscitate him.

At trial, Mohn's expert testified that his review of the record indicated that the hospital's failure to act in the face of certain information, e.g., detection of decreased urine output by Mohn, x-ray findings (which showed early pulmonary edema—fluid in the lungs) and blood results between 2:00–3:00 a.m.—which were abnormal and demonstrated development of metabolic acidosis (inability of heart to pump fluid to kidneys), was not in accordance with accepted medical practice. This "do nothing" approach, opined the expert, precipitated a deterioration in Mohn's condition and led to the respiratory arrest, a result which could have been avoided had appropriate measures been taken early on.

The hospital, through its experts, contended that it did not depart from accepted medical practice, and that Mohn's infirmities (motor problems—weakness in all four extremities, loss of sensation, spasticity, etc.) were "nothing other than the natural progression of his pre-existing disease." As for the arrest, it was the opinion of the hospital's experts that, rather than caused by the congestive heart failure, it was attributed to "probably mucous plug aspiration possibly on top of some underlying soft tissue."

As properly characterized by Mohn in his brief to us, the case reduced itself to a "battle of experts" on the issues of negligence and causation. The jury, after hearing from all sides, and being instructed by the court on the law, returned a verdict in favor of Mohn and his wife (for her loss of consortium claim) in the amount of $1,776,000.00 and $1,175,000.00, respectively. Pursuant to Pa.R.Civ.P. 238, damages for delay were added and the verdicts were molded to $2,440,175.33 for Mohn and $1,614,417.80 for his wife. Post-verdict motions were filed and denied. After the verdict was reduced to judgment, this appeal followed.

Hahnemann Hospital complains that the trial court committed reversible error in allowing its expert witness (Dr.

Urbach) to be cross-examined with regard to his receipt of fees for medical-legal cases other than the one being tried, and cites *Zamsky v. Public Parking Authority of Pittsburgh*, 378 Pa. 38, 105 A.2d 335 (1954) in support of its contention.

The trial court attempts to minimize *Zamsky* by labelling it an "outdated and questioned decision" that, at best, should be restricted to its facts.

At the outset, be it known that, regardless of the vintage of a case or its attack by legal scholars in their erudite treatises on the state of the law, in the final analysis it is for the highest court in this jurisdiction to decide when and to what extent, if any, a case has lost its vibrancy so as to signal its demise. No trial court is to usurp this function under the guise of changes presaged by the winds of judicial time, marked by the shifting tides of legal thinking. See Concurring Opinion of Chief Justice Nix in *Commonwealth v. Brady*, 510 Pa. 123, 136, 507 A.2d 66, 72 (1986) ("Regardless of how laudable the trial court's intentions may ... be[ ], ... its unauthorized refusal to apply existing law cannot be tolerated. To permit such a practice will throw the administration of justice and the expectations of litigants into utter confusion.").

It is interesting to note that both sides draw differing conclusions from the *Zamsky* decision, one approving of the questioned cross-examination and the other denouncing it as violative of established Pennsylvania law. We will lay this divergence of opinion to rest now.

In *Zamsky*, property was acquired by a public authority, and the compensation offered to the tenants was challenged in court and resulted in a verdict in their (tenants') favor. On appeal, the Supreme Court reversed and awarded a new trial because the court below permitted the authority's expert to be interrogated concerning fees acquired over more than five years for "services rendered" to the authority in its acquisition of numerous pieces of property. Objection was made but overruled, and the witness-expert testi-

fied to the fees received and anticipated in the future from the authority. The Court concluded:

> Thus the plaintiffs got before the jury that for services not rendered on the trial of this case (except in part) the firm of the expert witness had been paid $17,866.32, and in the future expected to receive $7,500 to $8,100. Thus error was thrice compounded, as we have said, and in addition consisted in admitting what the witness earned, not as an expert witness, but for general services to the Authority. This examination was clearly prejudicial error which must have contributed to the large verdicts for the plaintiffs.
>
> It is entirely proper to inquire of an expert witness what his fees are for testifying in the case on trial. *Commonwealth v. Simmons*, 361 Pa. 391, 403, 65 A.2d 353; *Grutski v. Kline*, 352 Pa. 401, 404, 43 A.2d 142; *Reed v. Philadelphia Transit Co.*, 171 Pa.Super. 60, 62, 90 A.2d 371, 33 A.L.R. 1166. But none of the reported cases go to the length that was permitted here, and in overruling the appellant's objection the court abused its discretion. The earnings of the expert witness from other services performed for the defendant were a purely collateral matter and the testimony thereon was not admissible to affect his credibility.

The judgments are reversed and new trials ordered. 378 Pa. at 40, 105 A.2d at 639. Instantly, as in *Zamsky*, the expert was permitted to be cross-examined as to the fees he earned, other than as an expert for the defense.

In particular, the scenario begins with counsel for the Mohns/plaintiffs having Exhibit P–30 (the complete financial records of Dr. Urbach) marked for identification. This was permitted over the objection of defense counsel. Dr. Urbach explicated that:

> ... the filing system in [his] office is that whoever pays the bill has a ledger card of his or her own, whether it's an agency or an individual or whatnot. If the bill was paid by an agency, that would be a ledger card, if the bill was paid by a law firm, that would be a ledger card.

Now, in these ledger cards, there are, of course, payments for legal reports, appearing in court, examining patients for legal purposes. They are also payments for patients treated, patients evaluated. In other words, patients that were taken care of, treated medically, hospital bills, for whatever reason, were paid by an agency or a law firm. So that all these ledger cards, all these dollar amounts and all these dates do not just refer to medical reports, appearance in court, or that kind of thing. They also refer to treatment of patients, consultations at the request of other physicians, and what-have-you, so long as the bill was paid by an agency or by a law firm.

When Dr. Urbach was asked if the ledger cards produced were *all* of medico-legal cases, he answered that it depended on counsel for the plaintiffs' definition of the term. Counsel's offer that he considered the instant suit such a case was rejoined with an example by the doctor that a bill for whom a person became sick on the job and necessitated a pacemaker was included in his ledger cards. As it was, the bill was paid by an attorney after the implant surgery and the patient's return to work.

To counsel for the plaintiffs' question as to whether he had tabulated the figures for any of the years represented by the ledger cards, the doctor stated he had not done so. Counsel then advised the doctor that during the morning session of the trial, his (counsel's) secretary had added the amounts starting with the year 1979. At this point, defense counsel's objection to the admission of such figures was overruled, and plaintiffs' counsel was permitted to read the five yearly tabulations collated from the cards, i.e., for 1979 the amount was $54,652; for 1980 the figure was $59,832; for 1981 the total was $108,636; for 1982 the calculation was $124,507; and for 1983 (up until the trial date) the breakdown came to $55,165.

■ No one disputes that *Zamsky* approves of cross-examining an expert as to the amount of his compensation for testifying in the case on trial. This same thinking has been extended to permit inquiry into a physicians personal friend-

ship with a party to a suit or a party's attorney so as to expose his interest in or bias towards either side of the lawsuit. *Downey v. Weston,* 451 Pa. 259, 301 A.2d 635 (1973). In this regard, we find proper the trial court's allowance of the plaintiffs' query about the existence of the financial relationship between Dr. Urbach and defense counsel's firm, which spans approximately twelve (12) years and is still extant as evidenced by some thirty (30) cases in which the two are still actively involved.

■ We do not believe, however, that the case law in this jurisdiction would condone the type of extensive disclosure of an expert's fee generating cases, especially since they were not related to the case at bar (except tangentially) nor were all of them, to coin a phrase utilized by the parties, "medico-legal" cases. There must be, and is, a point beyond which inquiry is/will be held to be prejudicial, too intrusive and only serving to divert the case into collateral matters. The inquiry should not be allowed into these other cases.

As first observed by this Court, a little less than half a century ago, questioning a witness as to the amount of remuneration he was to receive for testifying in a personal injury case was held to be "competent", even though it might have had only a nominal effect upon his impartiality. This was so because the jury was entitled to weigh his testimony in light of *his relation to the party calling him. Duffy v. Griffith,* 134 Pa.Super. 447, 4 A.2d 170 (1939). Thus, inquiry was not to be unbridled, but, rather, it was to be allowed "within reasonable limits" so as to bring to the fore a medical witness' compensation for testifying.

Six years later, in *Grutski v. Kline,* 352 Pa. 401, 43 A.2d 142 (1945), our Supreme Court found that a jury's award against a rear-seat passenger, injured through no fault of her own, may have been prompted by trial errors in disallowing, initially, defendant's doctors to be asked what compensation they were receiving. Later on in the trial, recognizing the error of its ruling, the court permitted, without cross-examination, counsel for the defendant to state to the

jury that the doctors would receive a reasonable amount, based on no prearrangement, of two or three dollars over what a usual witness would receive as a fee. The Supreme Court found the logic from the *Duffy* decision to be persuasive and quoted from it extensively, especially with regard to limiting, in a reasonable manner, the scope of a witness' stipend for testifying.

The Court also remarked that:

It was pertinent for the jury to know what arrangements the doctors had made or were contemplating making for compensation for their services *in the case* and the trial judge's refusal to require them to testify under oath, and subject to cross examination, constituted substantial error which makes necessary the granting of a new trial.

352 Pa. at 407, 43 A.2d at 144 (Emphasis added).

Following in the footsteps of *Grutski* and *Duffy* was *Reed v. Philadelphia Transp. Co.*, 171 Pa.Super. 60, 90 A.2d 371 (1952), wherein this Court found that the prohibition by the trial court of questioning the same doctor who appeared in *Grutski,* on the subject of recompense for testifying in the case, was reversible error. The appeal's court recognized that the *Grutski* and cognate cases should be liberally construed so as not to be interpreted to require that questions on compensation be framed in the exact words of that opinion, as had been erroneously believed by the trial court there. To the same effect see *Commonwealth v. Simmons*, 361 Pa. 391, 65 A.2d 353 (1949).

Next in line came *Zamsky*, which we have already discussed and find to be alive and well in Pennsylvania. Accord *Profit-Sharing Blue Stamp Co. v. Urban Redevelopment Authority*, 429 Pa. 396, 241 A.2d 116 (1968).

As a general proposition, impeachment is interjected into a lawsuit for the purpose of affecting the credibility of a witness. This is accomplished by exposing any interest or bias such an individual may have in the dispute for the trier-of-facts consideration. *Price v. Yellow Cab Co. of Philadelphia,* 443 Pa. 56, 278 A.2d 161 (1971); 2 Henry,

Pennsylvania Evidence, § 811 (1953). However, the field of inquiry is not unbounded; it is limited by the requirement that the question(s) posed be relevant to establishing a witness' credibility. See 3A Wigmore on Evidence, § 922 at 726 (Chadbourn rev.1970). To exceed the line of inquisition denominated "relevant" runs the risk of exposing the witness or the party on whose behalf he appears to the danger of being unduly prejudiced. See McCormick on Evidence, § 29 at 59 (1972). At bar, as discussed by counsel for the defense, the plaintiffs, in their closing argument, and the trial court, in its charge, characterized Dr. Urbach as a "hired gun" who peddles his expertise randomly and generates a large amount of revenue in the process.

It is true, as made mention of in the trial court's opinion to us, that Dr. Urbach should be required to "lift his visor so that the jury could see who he was, what he represented, and what interest, if any, he had in the *results of the trial,* so that the jury could appraise his credibility." *Goodis v. Gimbel Brothers,* 420 Pa. 439, 445, 218 A.2d 574, 577 (1966) (Musmanno, J.) (Emphasis added). However, we do not think this encompasses the emptying of one's pockets and turning them inside out so that one's financial worth can be open to scrutiny.

Credibility was the question, and the permissible bounds of assailing it were exceeded when the expert's total income, unrelated (quoting from the trial court's own citation of *Goodis* ) to the "results of the trial", was exposed to the jury. See *Zamsky,* supra. Consistent therewith, we conclude that, under the facts of this case, the nexus between Dr. Urbach's compensation for *all* services rendered (which included work for private and governmental agencies, patients and other law firms) from 1979 to 1983, *exclusive of those received for work performed for defense counsel's law firm,* and his credibility on the witness stand is tenuous at best. See *Downey,* supra.

Although a trial court is vested with the authority to set the perimeters of cross-examination, it is subject to having its decision reviewed and reversed if found to be the prod-

uct of an abuse of discretion. See *Grzywacz v. Meszaros,* 417 Pa. 51, 208 A.2d 237 (1965). We so find and hold that the challenged evidence was erroneously admitted and prejudicial to the hospital, given the rather large verdict awarded and the hospital's admitted reliance on Dr. Urbach as a vital witness to its case on the question of liability. In this situation, we need not consider the other alleged trial errors.

Judgment reversed and the case remanded for a new trial. Jurisdiction is not retained.