## Lesnick v. Ruane

*Mayer Horwitz,* for plaintiffs.
*Walter J. Timby Jr.,* for defendant.

AVELLINO, *J.,* January 20, 1988 — Robert Lesnick was injured in an accident and filed this lawsuit to recover damages. Thereafter, defendant moved to have him examined by an orthopedic surgeon, William A. Simon, M.D. Lesnick concedes there is "good cause"[1] for the examination, but argues that we should "disqualify" this physician from performing it.

---

1. See Pa.R.C.P. 4010(a). "Whenever . . . the physical condition . . . of a party . . . is in controversy, the court . . . may order the party to submit to a physical . . . examination by a physician. . . . The order may be made only on motion for *good cause* shown. . . ." (emphasis supplied)

Plaintiff's counsel has supplied an affidavit which recounts a lengthy history of antagonism between himself and Dr. Simon. This affidavit also lists numerous instances over the years in which Dr. Simon reported finding no objective evidence of injury despite contrary evidence from the attending physicians for counsel's other clients. Finally, it avers that Dr. Simon is a "hired gun," who derives virtually all of his income from being a professional witness. Defendant is underwhelmed by this affidavit, and insists that he has the right to choose his own medical expert.

We agree with defendant.

Meanwhile, this species of discovery dispute is a persistent pest that judges have been trying to exterminate for years. Somehow it has managed to survive, and judging from this and similar motions, it continues to be a source of aggravation for lawyers, and an irritant for those physicians who are obliged to suffer ex parte assaults on their candor and skills. We shall do our best to kill it humanely.

We begin by observing that the practice of requiring a physical examination of a plaintiff in an action for personal injuries began in Pennsylvania about a century ago with an unknown Philadelphia judge in the case of *Lawrence v. Keim,* 19 Phila. Rep. 351, 45 L.I. 434 (C.P. No. 2, Phila., 1887). Back then, many of the decisions were simply "reported" and not printed in an opinion format. According to the reporter, the judge wrestled with the question of whether he had the lawful authority to grant defendant's novel rule. The decisions in other states were conflicting, and the federal decisions were to the contrary. In the end, he granted the rule by basing his decision on the Act of April 15, 1869, which authorized one party to call another as on cross-examination, and the Act of February 27, 1798, which

provided for the production of books and papers. In brief, he ruled that producing the body of a party for a physical examination was no different from producing the books or records of a party and was, in effect, an aspect of cross-examination. See also, *Hess v. Lake Shore & Michigan Southern R. R. Co.*, 7 Pa. C.C. 565 (C.P. Erie Co. 1890) and *Demenstein v. Richardson*, 2 Dist. 825, 34 W.N.C. 295 (C.P. no. 1, Phila., 1893).

These early decisions are instructive, in part, because they illustrate the valiant efforts exerted by judges to overcome the plain fact that discovery, as we know it, did not exist at common law. The Industrial Revolution was on, and the new technology, crude by our standards, was inflicting injury — and producing lawsuits — at a steadily increasing rate. Meanwhile, it was also occasioning claims of another sort, which Judge Biddle called "railroad spine." See *Demenstein v. Richardson, supra,* at 826.

More important, for our purposes, is the fact that the practice authorized by these early decisions was later approved by the Supreme Court in *Cohen v. Philadelphia Rapid Transit Company*, 250 Pa. 15, 95 Atl. 315 (1915), and thereafter was regulated in many counties by local rule. When Statewide Rule 4010 was adopted in 1950, it codified and continued existing practice. See 10 Goodrich Amram 2d, 4010:1, 4010:2.

That practice, meanwhile, had birthed the following principle which is everywhere described as "well settled."

"Ordinarily, the applicant should have the right to select his own physician, and the party to be examined should have no right to select the [person] whom his opponent must choose." 10 Goodrich Amram 4010(a)8.

The cases cited by Goodrich Amram for this principle include *Rose v. McNulty Bros. Company,* 65 P.L.J. 54 (1916), *Prinzas et al. v. Lewis etc.,* 50 D.&C. 44 (1944), and *Sperath v. Thomas,* 48 D.&C. 2d 309 (1970). In *Rose,* plaintiff objected to defendant's physician on the ground that he was prejudiced against plaintiff's counsel. In *Prinzas,* plaintiff objected on the ground that defendant's physician was untrustworthy as a witness. In *Sperath,* plaintiff objected on the grounds that the physician was both untrustworthy and "rough." There are intervals of approximately 25 years between each of these cases. In each, the objection asserted was dismissed as irrelevant.

Meanwhile, the few reported decisions that have ostensibly "disqualified" a physician[2] from performing a physical examination — with one exception — seem to be only examples of judicial recognition of medical ethics. In both *Fryer v. Travelers Indemnity Ins. Co.,* 15 D.&C. 3d 649 (1980) and *Shea v. McCadden,* 46 D.&C. 2d 560 (1969), the seminal question was whether the court should allow itself to become an accomplice to a violation of medical ethics by directing a party to submit to an examination by an expert who had previously served as the examinee's attending physician.

It is not surprising that these courts declined that sort of invitation. What does puzzle is why the courts ruled at all. For example, in *Fryer* the court characterized its ruling as relieving the physician of the ethical burden of having to make a decision. *Fryer v. Travelers Indemnity Ins. Co., supra,* at 62. We are not inclined to be so generous. Our practice in such cases is to defer adjudication pending re-

2. Rule 4010 itself disqualifies a non-physician. See *Stokes v. Mattie,* 16 D.&C. 3d 565 (1980).

ceipt of an affidavit from the physician. The affidavit must express the physician's opinion on the ethical question — whether he or she believes it is proper to accept subsequent employment, which is likely to require a disclosure of facts learned and opinions formed in the context of confidential relationship, and which entails a high risk that he or she will become embroiled in an adversarial role with a former patient. Our experience suggests that when we give a physician an opportunity to pause and reflect, the physician invariably declines an offer of subsequent conflicting employment.

We believe that ethical decisions are matters of conscience that are best left to the person affected for initial resolution. We routinely offer this opportunity to members of the legal profession, and should not deny it to those in other learned professions. Meanwhile, the use of an affidavit to resolve ethical questions of the type which confronted the court in *Fryer* and *Shea* has been approved by Judge Wettick. See *Williams v. Penn Central*, G.D. 77-4582 (Allegheny Co. 1979). A copy of this opinion may be found in Allegheny County Discovery Opinions (1978-1986) at page 91.

We could find only one reported decision that actually "disqualified" a physician on grounds that he had a bad reputation. *Bennett v. Clark Equipment*, 54 D.&C. 2d 207 (1971). In that case, the court relied upon *Narzisi v. Meyer Dairy Corporation*, 22 D.&C. 258 (1933)[3] for the well-settled principle that

---

3. *Narzisi* was also cited as authority to "disqualify" a designated physician, and it is accurate to say that in *Narzisi* one of the two physicians designated for a repeat examination of plaintiff was disqualified by the court. Unfortunately, the court did not explain why and simply noted that "the learned counsel for the plaintiff has stated to us the reasons why he objects . . . We think they are good reasons, and another doc-

an examinee ought not be exposed to the infliction of pain, additional injury, or just plain rudeness. Yet, instead of regulating the conditions of the examination to avoid the risk of such mischief — a procedure which Rule 4010 expressly authorizes — the court "disqualified" the expert. It based its decision to do so upon the depositions of "numerous" members of the Montgomery County Bar, which stated, inter alia, that the physician was an "untrustworthy witness."

We decline to follow *Bennett*. In *Deluca v. City Stores*, 69 D.&C. 2d 486 (1974), Judge Bradley of our court refused to "disqualify" the very same physician on a record that was practically identical to that which was before the court in *Bennett*. He explained that he was not bound by a ruling of another court of equal jurisdiction, and went on to express his view that trial is the better forum to test an expert's candor.

That, of course, is precisely the same view that is reflected in the line of cases we mentioned earlier. In *Prinzas v. Lewis, supra*, at 46, it was stated as follows: "If, as plaintiffs allege, said physician is a professional witness, unscrupulous, and disreputable, this can be proved at trial to affect the weight and credibility of his testimony."

Recent reported decisions continue to express this view. In *Richwine v. Smith*, 36 Cumberland L.J. 30 (1985), the court declined to disqualify a de-

---

tor should be selected by the defendant." Since we can only speculate as to those reasons, this case offers a slippery foundation for the decision in *Bennett*..Meanwhile, the opinion in *Narzisi* focused largely on the issue of the propriety of repeated physical examinations in cases of progressively deteriorating illness. The disqualification matter received scant attention from the court.

fendant's physician, noting, "If an opposing party suggests that a witness is biased, the remedy is to seek to impeach that witness's testimony."

Meanwhile, it may be useful to remind counsel that ours is an adversary system of justice. Physical examinations under Rule 4010 are not impartial, or independent, nor limited to just one class of litigants. See, for example, *Burke v. Bowen,* 8 D.&C. 3d 109 (1978), which held that a defendant may be ordered to submit to an eye examination when his ability to see "is in controversy."

In *Richwine,* this point was made with the following quotation from the Supreme Court of Colorado:

"[i]t has nowhere been held that the purpose of [the discovery rules] is to eliminate the adversary system as the foundation of the American judicial process. So long as a plaintiff may select his own doctor to testify as to his physical condition, fundamental fairness dictates that the defendant shall have the same right. . . ." *Timpet v. District Court of Denver,* 421 P.2d 728 (Colo. 1966).

"Fundamental fairness" also argues that we should refrain from disqualifying a designated physician on another ground. He or she is not a party to the litigation. As such, the physician is unrepresented and may even be ignorant of the accusation that he or she is an "untrustworthy witness." To disqualify a physician on the basis of an unchallenged affidavit would add the prestige of the court to ex parte criticism. A ruling of this court is likely to visit irreparable harm upon anyone's reputation.

Meanwhile, this problem is only compounded if we insist that the physician respond to the examinee's charges. That, in turn, would force us to litigate what amounts to a complex defamation ac-

tion in the guise of a discovery motion.[4] The time and expense associated with mini litigation of this type would have a chilling effect upon a party's choice of expert, and invite "expert wars" in which there would be no winners.

Moreover, assuming we were somehow persuaded that an expert was not candid on one or more previous occasions, that finding does not justify a leap of faith to the conclusion that the expert will never again tell the truth. A witness with a recent history of convictions for crimes involving dishonesty is permitted to testify. In such cases, the jury is told of the witness' past misconduct and instructed to weigh the testimony as it sees fit. *Commonwealth of Pennsylvania v. Randall,* 515 Pa. 410, 528 A.2d 1326 (1987). It is a curious logic that argues that we should preclude one witness with a suspect reputation, and yet allow the testimony of another whose dishonesty has been established beyond a reasonable doubt.

In our opinion, the correct rule is that the outright disqualification of a physician designated for the purposes of Rule 4010 is beyond the appropriate exercise of judicial discretion.

In reaching this conclusion, we have been influenced, in part, by like decisions made years ago. Those rulings are more than whispers from past generations of jurists. They have been tested by the clamor of modern times and speak to us now louder and more urgently than before. The major litigation of today has evolved into a battle between experts in which the parties are often the least important wit-

---

4. Under Pa.R.C.P. 209 we may receive evidence on disputed issues of fact only by deposition or affidavit. To determine whether a witness is "trustworthy" within these parameters would be, at best, a sticky business.

nesses on the issues of liability and damage. See *Mohn v. Hahnemann Medical College & Hospital,* 357 Pa. Super. 173, 515 A.2d 920 (1986). As a consequence of this development, one of the most vexing strategic decisions for counsel is choosing the right expert to advance a claim or a defense. It is a task that requires both the eye and the ken of a skilled litigator. Qualifications may be less important than demeanor, and the proven ability to establish a rapport with a fact finder is a highly prized commodity. Making these choices is the stuff of advocacy, not jurisprudence.

Our proper role in these matters is the one expressly set forth in Rule 4010 itself. If there is a genuine risk that a designated physician may inflict pain, cause injury, behave rudely or, perhaps, lie about the tests he performs and his findings, the answer is to regulate the manner, conditions and scope of the examination.[5] In pre-rule decisions, the court routinely conditioned examinations upon the presence of the examinee's own physician. See, for example, *Stasko v. Smith,* 16 D.&C. 726 (1932) and *Prinzas v Lewis, supra.* In more recent times, it has been customary to authorize the examinee to appoint a representative to be present throughout. *DeLuca v. City Stores, supra.* Judge Wettick routinely authorizes the audio recording of mental examinations. *Koch v. Galardi,* 11 D.&C. 3d 750 (1979). Meanwhile, in one unreported decision we recently authorized the videotaping of an entire physical examination.[6]

5. See Rule 4010(a). "The order . . . shall specify the time, place, manner, conditions and scope of the examination. . . ."

6. The matter was one of first impression in Pennsylvania, and reconsideration has been granted. The only other jurisdiction to consider the issue ruled otherwise. See *Edmiston v. Superior Court of Los Angeles County,* 586 P.2d 590 (Cal. 1978).

In brief, we have the lawful authority under Rule 4010 and, if necessary, under Rule 4012 to fashion an appropriate remedy to avoid the risk of mischief. On occasion, the conditions imposed may cause the designated physician to decline to perform an examination. That, of course, is the physician's right, and usually leads to a substituted designation which, in turn, often obviates the need for any unusual conditions.

Finally, since plaintiff's motion asks only that we "disqualify" Dr. Simon, it is not appropriate to decide whether the affidavit we were supplied warrants the imposition of any unusual conditions upon the scope or manner of the proposed examination in this case. That question was not raised by counsel, and we decline to address it.

For these reasons, we direct that the following order be entered:

### ORDER

(1) Plaintiff, Robert Lesniak, shall submit to an orthopedic examination by William H. Simon, M.D., 255 South 17 Street, Philadelphia, within 45 days.

(2) Plaintiff shall have the right to designate a person who may remain with him throughout the examination.