## Farmer v. Supermarkets General Corp.

*John C. Capek,* for plaintiff.
*Leslie Anne Miller,* for defendant.

AVELLINO, *J.,* April 11, 1991—In this personal injury action, defense counsel selected (or "hired") Elliott A. Schulman, M.D. to conduct a physical examination of plaintiff, Arlean Farmer, and, hence,

to supply a written report afterwards as required by Pa.R.C.P. 4010(b)(1). A few days before the scheduled examination, which was conducted on a "stipulated" basis, Ms. Farmer's lawyer mailed a hopelessly innocuous one-page letter to Dr. Schulman.[1] The letter contained a "list" of Ms. Farmer's medical records which counsel, courteously I think, enclosed for the doctor to review. More importantly, perhaps, counsel used the last paragraph of his letter to "request" copies of Dr. Schulman's report.[2]

After the examination was completed, Dr. Schulman took an odd stance: He refused to send *defense counsel* a copy of his report on the (mistaken) grounds that he had been hired by plaintiff's counsel. Dr. Schulman eventually emerged from his "confusion"[3] and "released" his report. Defense counsel took an even *odder* stance *after* she read his disappointing comments: She *contended* that her

---

1. The opening sentence of counsel's letter speaks volumes about its innocent character: "On Monday [four days hence], you are scheduled to examine my client, Arlean Farmer, *on behalf of the defendant, Supermarkets General Corporation.*" (emphasis supplied) For the full text of the letter, see Appendix A. I should add, perhaps, that this letter was the only "communication" between plaintiff's lawyer and Dr. Schulman *before* Ms. Farmer was examined. See, e.g., plaintiff's memorandum at 2 ("Aside from [writing a letter I] did *not* confer in any way with [Dr. Schulman] prior to the examination. . . . [Indeed] I did not [bother to] attend the medical examination with [my client].").

2. See Appendix A ("I would *appreciate* your . . . forwarding your report to . . . Mrs. Farmer's treating physician [and a copy to me].") (emphasis supplied)

3. See, e.g., defendant's motion to compel at paragraph 9 ("[Dr. Schulman] admitted [to my partner] that he had been confused about his *responsibility* and was working under the impression that he had been *retained* by plaintiff's [lawyer].") (emphasis supplied)

client had been deprived of the "benefit" of an "independent", physical examination. Hence, she asked Ms. Farmer to submit to a *second* examination by a physician *other* than Dr. Schulman. Ms. Farmer refused, explaining, in substance, that one physical examination of her body was enough to satisfy her discovery responsibilities.[4] Afterwards, defense counsel presented the motion to compel a physical examination that is presently before me.[5]

---

4. See, e.g., *id.* at Exhibit G (indignant letter from plaintiff's counsel stating, in part, "What exactly is your accusation?" adding, "Are you saying that [the doctor's] opinion would have been different if he had known in advance on whose behalf he was examining this woman?").

5. Defense counsel is a discovery "maven," see, e.g., Miller, *Depositions—An Overview,* in Philadelphia Discovery Practice 74 (PBI No. 1990-591), and her motion may·be animated, at least in part, by her (understandable) zeal for "winning." Yet, she was unable to find a *solitary* decision to support her (novel) interpretation of Rule 4010. This fact caused plaintiff's counsel to question her "motives" for dragging him into "discovery court." *Query:* Are the discovery rules responsible for creating too much "tension" between a lawyer's "zeal" for winning and the duties she owes her opponent as well as the tribunals that license her to practice law? For an intriguing discussion, see, e.g., Shapiro, *Some Problems of Discovery in an Adversary System,* 63 Minn. L. Rev. 1055 (1979) (blaming the discovery rules). But see American College of Trial Lawyers, Code of Trial Conduct, Standard No. 23 (1982) (articulating the "honesty, candor and fairness" that America's finest trial lawyers expect from each other and concede that they owe to the courts in which their clients' cases are pending). Accord Pennsylvania Rules of Professional Conduct 3.2-3.4 (1988) (articulating analogous but *minimum* standards for candor, and so on, laid down for Pennsylvania lawyers). Considering the conduct standards laid down in the professional codes, the "tension" question is probably contrived, and boils down to a private ethical concern, e.g., when should a "maximum" lawyer present a "minimum" discovery motion?

I must deny this motion, largely because Rule 4010 does not authorize a defendant to obtain *successive* physical examinations of a plaintiff until the defendant eventually obtains an expert's report that makes him "happy."[6]

Briefly, defense counsel's argument embodies two myths (or "fictions"): (1) that plaintiff's counsel *"interfered"* with the scheduled examination by "communicating" with Dr. Schulman; and (2) that Rule 4010 envisions a physical examination that is *"independent"* (or, perhaps, "impartial").

These myths are easy to explode since they don't have a legal (or factual) foundation worth mentioning. To begin with, nothing in Rule 4010 prevents an examinee or her lawyer from "communicating" with an examining physician by giving him medical records (or so on). As a practical matter, most physicians are delighted to have an examinee's medical records since they typically use the information gleaned from these records to formulate their own reports.[7] Meanwhile, plaintiff's counsel hardly committed a legal error by "requesting" copies of Dr. Schulman's report. Counsel's "request," after

---

6. Stated differently, I don't think that Rule 4010 authorizes "doctor-shopping." It might be risky for the reader to infer more than this from what follows. For example, I don't mention (or discuss) any of the case decisions involving "repeat" examinations of a plaintiff by the same physician, or "second" examinations of a plaintiff by a physician who is an "expert" on a different medical subject than the physician who performed the first examination. For a modest collection of the reported decisions on these subjects, see, e.g., 7 Standard Pa. Practice 2d §37:14 (1982).

7. See, e.g., Pa.R.C.P. 4010(b)(1) (describing the information that an examining physician is required to include in his report). See also *id.* ("entitling" an examining party to *demand* that the examinee produce her medical reports after supplying her with the examining physician's report).

all, is hardly the functional equivalent of a legal "condition," or perhaps, a court "order." Moreover, as Judge Wettick has explained, nicely I think, plaintiff's counsel is *entitled* to an unredacted copy of *all* of Dr. Schulman's reports respecting Ms. Farmer.[8]

More importantly, perhaps, I can't find the word "independent" anywhere in Rule 4010, and I doubt that the Supreme Court ever intended that I should.[9] As I've explained in other cases, *litigants,* as opposed to judges, rarely if ever select experts on "impartiality" (or "objectivity") grounds.[10]

True, Dr. Schulman blundered, forgetting which side had hired him.[11] Yet, Pennsylvania insists, wisely I think, upon administering justice with an adversary process.[12] Because of Pennsylvania's de-

---

8. *Ferguson v. Redstone Acoustical & Flooring Inc.,* 21 D.&C. 3d 475 (1981) (ending the odious practice whereby an examining physician prepared two reports, one for the examinee's consumption and another for the "benefit" of the party who hired him).

9. See Pa.R.C.P. 126 and 127 (supplying guidelines for judges attempting to glean Supreme Court intent).

10. See, e.g., *Lesnick v. Ruane,* 48 D.&C. 3d 535, 541 (1988) ("[I]t may be useful to remind counsel that ours is an adversary system of justice. Physical examinations under Rule 4010 are not impartial, or independent, nor limited to just one class of litigants.").

11. Although it is unnecessary for my decision, I could hardly help but notice that Ms. Farmer's lawyer was not present when his client was examined. His absence doubtlessly explains why he wrote to Dr. Schulman to begin with, and may also explain why Dr. Schulman ended up "confused" about the "status" of Ms. Farmer.

12. For the classic discussion of the "legitimacy" of the adversary process, see Fuller, *The Forms and Limits of Adjudication,* 92 Harv. L. Rev. 353 (1978) (justifying "legitimacy" on philosophic as opposed to "legal" or "political" grounds). See also, Subrin, *How Equity Conquered Common*

votion to this process,[13] I think that everyone connected with this case, including me, is required to assume that Dr. Schulman's report is *candid* unless, of course, he is prepared to say otherwise, e.g., to supply a ''second'' report explaining that his first report was ''wrong.''[14]

---

*Law: The Federal Rules of Civil Procedure in Historical Perspective,* 135 U. Pa. L. Rev. 909, 988 (1987) (''The major purpose of courts was not just to resolve disputes. They could have done that with the ancient trial by ordeal or by flipping coins. As Lon Fuller and others have taught us, it is resolving disputes through reasoned and principled deliberations based on rules that is at the heart of adjudication. This is what [gives] courts and judges their legitimacy.''); Resnik, *Failing Faith: Adjudicatory Procedure in Decline,* 53 U. Chi. L. Rev. 494, 504-05 (1986) (''The 'adversary system' was [the rule makers'] shorthand for the procedures they sought to foster—a lawyer-based process in which each side was responsible for generating information to be used either by the parties (to reach an accommodation) or by judges and juries (to assess and then to impose an outcome). . . .' These men spoke as if they had a belief, fairly termed 'faith,' in adversarial exchanges as an adequate basis for adjudication, in adjudication as the essence of fair decision-making, and in fair decision-making as essential for legitimate government action.'').

13. On Pennsylvania's devotion to the adversary process, see, e.g., *Klemow v. Time Inc.,* 466 Pa. 189, 352 A.2d 12 (1976) (broadly endorsing party ''prosecution'' and ''presentation'' which, along with an ''impartial adjudicator,'' are core concepts of an adversary process, and ''scolding'' a trial judge who ''served'' discovery requests upon litigants in an effort to obtain the information he needed to decide a pretrial motion); see also, *Kirsch v. Parking Authority of New Castle,* 108 Pa. Commw. 259, 529 A.2d 604 (1987) (reminding trial judges that they are not empowered to enforce the discovery rules on a sua sponte basis, and instructing them to act only ''upon motion''); *Graham v. Commonwealth, Dept. of Environmental Resources,* 79 Pa. Commw. 403, 469 A.2d 709 (1984) (reminding trial judges that they are not empowered to enforce the discovery rules until a discovery demand has been *made* and *refused*).

Since I don't have a "second" report from Dr. Schulman, and don't expect one,[15] I think that defendant, as opposed to plaintiff, must accept the "risk" that the expert it selected might supply a "disappointing" report.[16] Stated differently, I think that litigants and judges have a right to expect "candor" from any person who prepares a document, like a discovery response, that is *specifically designed* to be used in *judicial* proceedings, albeit during the pretrial process.[17]

---

14. See, e.g., Pa.R.C.P. 4007.4(2) (obliging a party or her "expert" to "correct" their discovery responses if either acquires information that causes them to believe that their initial response was incorrect or is no longer valid). See also, *id.,* Explanatory Note—1978 ("The test in new Rule 4007.4 is whether . . . the expert witness knows that the response was incorrect or is no longer correct in the light of intervening events of which he has knowledge. . .. The [new] rule [goes beyond] the [analogous] Federal Rule by including . . . 'an expert witness'; The Federal Rule includes 'a party' only."). Accord *Goughnour v. 84 Lumber Co. et al.,* 98 York Leg. Rec. 4, 6 (1984) (applying the test laid down in the Explanatory Note to a Rule 4003.5 "expert" witness).

15. Although lawyers frequently accuse their opponents' experts of being "hired guns," *Kohn v. Hahnemann Medical College,* 357 Pa. Super. 173, 515 A.2d 920 (1986), it may be worth mentioning that defense counsel never made an analogous accusation about Dr. Schulman. But see note 3, *supra* (implying that Dr. Schulman's report would have been different were he not "confused" about his "responsibility").

16. Cf. *Timpte v. District Court of Denver,* 421 P.2d 728, 729 (Colo. 1966) ("[I]t has nowhere been held that the purpose of [the discovery rules] is to eliminate the adversary system as the foundation of the American judicial process.").

17. See, e.g., Rule 4010(b)(1) (requiring an examining physician to prepare a comprehensive report of *"his"* examination, and requiring the party "causing the examination to be made" to "deliver" a copy of the doctor's report to the examinee upon "request"). (emphasis supplied) Although Rule 4010(b)(1) does not explicitly mention a "signature"

For these reasons, I direct the prothonotary to enter the following

ORDER

And now, April 11, 1991, defendant's motion to compel a second physical examination of plaintiff by a physician other than Dr. Schulman is denied.

*Appendix A*

April 16, 1987
Dr. Elliott Schulman
One Penn Boulevard
Philadelphia, PA 19144
Re: Arlean Farmer
D/A: 5/18/86
Dear Dr. Schulman:
On Monday, April 20, 1987, at 10 a.m., you are scheduled to examine my client, Arlean Farmer, on behalf of the defendant, Supermarkets General Corporation.

Mrs. Farmer was injured as a result of a large roll of plastic bags and the metal supporting them [striking] her on the back of her head when it fell from above her. She sustained various injuries to her head and neck. For your convenience, I am enclos-

requirement for a Rule 4010 physician, the need for a signature is easy to infer from the use of the pronoun, "his." Compare Rule 4003.5(a)(1)(b) (insisting that "specially retained" experts "sign" their discovery responses). See also note 14, *supra* (explaining that Rule 4007.4(2) imposes a self-executing duty upon an expert witness to correct false or misleading discovery responses). Accord *McDonnell v. Hagan*, 46 D.&C. 3d 370 (1987) (awarding sanctions in the form of compensatory damages to a litigant who was "victimized" by her opponents' misleading discovery responses).

 

ing several medical records for your review. They include the following:

Dr. Vincent Baldino

Dr. Arnold Sadwin

Dr. Lorenzo Runk

Dr. ·C. Richard Scipione

I would appreciate your reviewing these records prior to examining Mrs. Farmer and forwarding your report to Dr. Vincent Baldino, Mrs. Farmer's treating physician, as well as to this office.

Thank you for your continued courtesy and cooperation in this matter.

Very truly yours,

John C. Capek