708 A.2d 1086

**Linda J. WROBLESKI**

v.

**Nora L. de LARA.**

**No. 938, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

April 30, 1998.

Kreg Paul Greer, Towson, for appellant.

Mark W. Conforti (Ronald U. Shaw, Jennifer L. Bragg and Shaw & Brown, on the brief), Towson, for appellee.

Argued before HARRELL, SALMON and BYRNES, JJ.

SALMON, Judge.

The main issue presented in this case is whether it was permissible for an attorney to ask an expert witness on cross-examination to reveal the amount of compensation he had earned in the past from participating as an expert witness in other cases. Courts elsewhere have been divided as to this issue. This presents a question of first impression in Maryland.

## I. FACTS

Linda Wrobleski, in June of 1994, was a patient of Nora de Lara, M.D., a specialist in obstetrics and gynecology. On June 6, 1994, Dr. de Lara performed laparoscopic gynecological surgery on Ms. Wrobleski at Church Hospital in Baltimore, Maryland. Ms. Wrobleski was discharged from the hospital two days after surgery, but on June 11, 1994, she was rehospitalized and diagnosed as having peritonitis due to a perforation of the small bowel. A second operation followed, as did significant pain, discomfort, and disability caused by the peritonitis.

Ms. Wrobleski sued Dr. de Lara in the Circuit Court for Baltimore City for medical malpractice. In her complaint, she alleged, *inter alia*, that during the June 6th medical procedure, Dr. de Lara negligently perforated the small bowel. She further alleged that the operation should never have been performed in the first place due to her (plaintiff's) history of prior pelvic surgery, which made the potential for surgical

injury unacceptably high. In her answer to the complaint, Dr. de Lara denied all allegations of negligence.

A five-day jury trial commenced on January 28, 1997 (Strausberg, J., presiding). The trial, in essence, was a battle of the experts. Ms. Wrobleski called Dr. William Battle, a surgeon, and Dr. Max Lilling, an obstetrician and gynecologist (OB/GYN), as her experts. Dr. de Lara countered with the testimony of Drs. James Dorsey and Donald Chambers, both OB/GYNs.

Dr. Battle testified that in his opinion Dr. de Lara either punctured the bowel during the June 6th operative procedure or devascularized [1] a portion of the bowel during the operation. He further opined that Dr. de Lara acted below the applicable standard of care in failing to recognize during the procedure that the bowel was in fact either punctured or devascularized. According to Dr. Battle, damage caused by the operation required immediate surgical follow-up; but because the injury to the bowel was not recognized, corrective surgery was delayed for five days, and as a consequence, Ms. Wrobleski developed peritonitis.

Dr. Lilling was of the view that Dr. de Lara fell below the applicable standard of care in performing the laparoscopy because, as she admitted in her operative notes, she proceeded to slice or cut during the operation even though her vision was obstructed. In Dr. Lilling's words, "If we can't see, then we can't cut." He opined that "to continue on is to markedly increase the possibility that the unseen portion of the blade ... will ... cut something ... and it was at this time in trying to do that that the injury to the small bowel was caused." Dr. Lilling also testified that, based on Dr. de Lara's surgical notes, during the operation she saw a "pinpoint opening"—a sharply made cut or incision through the bowel. Having seen such an opening, Dr. de Lara should have either immediately closed it, or if she was not qualified to make the repair, she

---

1. Devascularization, as the term was used by Dr. Battle, means stripping the bowel's tissue of its critical blood supply.

should have called an abdominal surgeon "to evaluate and identify the needs of the bowel."

As might be expected, the two experts called by Dr. de Lara disagreed in all material respects with the expert opinions of Drs. Lilling and Battle. Dr. de Lara's experts opined that the bowel perforation was the result of abrasions to the serosa (the outer surface of the bowel wall). These abrasions likely interrupted blood supply to that area of the bowel wall, causing gradual necrosis that ultimately resulted in an opening that permitted bowel contents to leak into the abdomen. In their opinions, Dr. de Lara did not perform below the applicable standard of care prior to or after the June 6th procedure. According to the defense experts, abrasions of this type most often heal without need for surgical repair and without difficulty. Moreover, these types of abrasions often occur even when the surgeon uses the appropriate technique. Defense experts were of the opinion that the abrasions to the bowel wall were not the result of any malpractice on the part of Dr. de Lara.

When Dr. Max Lilling testified, defense counsel brought out the fact that Dr. Lilling, a resident of New York, had testified as an expert in fourteen states. Cross-examination also established, without objection, that, in the year 1995, Dr. Lilling had earned "about $27,000 from testifying and serving as an expert in" medical malpractice cases where Marvin Ellin, Ms. Wrobleski's trial counsel, served as the attorney for other plaintiffs. He also testified that he had been paid $2,500 for participating as a witness in the case at hand. It was also developed that over a five-year period Dr. Lilling had reviewed approximately twenty cases for Mr. Ellin, and over a seventeen-year period, the doctor had reviewed approximately six hundred cases for counsel representing both plaintiffs and defendants. Defense counsel also asked Dr. Lilling:

> And, Doctor, at deposition, you wouldn't tell me how much you earned last year in calendar year 1995 testifying as an expert. Are you prepared to tell this jury how much money you earned reviewing cases, serving as a medical

expert? Are you prepared to tell this jury how much you made in 1995?

Dr. Lilling replied:

> I told you what I made for [sic] Mr. Ellin and I gave you a percentage relevant to what that was, which is less than 20 percent of my income, and if I give you the next number, sir, you know my income and I don't think you have a right to know that.[2]

At that point, Ms. Wrobleski's attorney objected and said, "Excuse me. I object to his income unrelated to this [case], Your Honor." A bench conference ensued in which Ms. Wrobleski's counsel argued as follows:

> There is not one Maryland case, although there is an appellate case from Pennsylvania where they reversed the plaintiff's verdict because they asked this very question. I have the case [*Mohn v. Hahnemann Medical College and Hospital*, 357 Pa.Super. 173, 515 A.2d 920 (1986),] and I can have it faxed down during lunch because he is not going to finish now anyway.

> It's perfectly proper for him to ask how much has he earned from Ellin & Baker to show any bias, but to go beyond that, particularly when he does defense work, as well, is totally unrelated to any bias in my favor and I would like Your Honor to have the benefit of that Pennsylvania case. It was a reversal done by the [Superior] Court of Pennsylvania of this very question. There is no Maryland case, no appellate case that permits that question to be asked.

Judge Strausberg overruled the objection, saying that the jury was entitled to know the amount of income earned by the expert because such income "may—not necessarily will—. . .

---

**2.** Knowledge that Dr. Lilling made "less than 20 percent" of his yearly income as an expert, coupled with knowledge as to how much he earned annually as an expert, would not provide the questioner with even a rough approximation of the witness's annual income because "less than 20 percent" could mean anything from .01 percent to 19.99 percent.

color his testimony, his willingness to participate in these proceedings and see things a certain way."

After the bench conference, defense counsel asked the following question:

One more time, Dr. Lilling. Are you prepared to tell the ladies and gentlemen of the jury how much money you earned in the calendar year 1995 reviewing cases, testifying in depositions, testifying at trial as a medical expert? Are you prepared to give us a number for all your income for 1995, or, indeed, for any year?

The question was unsuccessfully objected to by plaintiff's counsel and the witness answered, "No, sir, I'm not." [3]

After all the evidence had been presented in the case, Ms. Wrobleski's counsel asked the trial judge to instruct the jury using *Maryland Civil Pattern Jury Instructions* 10:3, at 280 (1997), which reads:

The effect that an injury might have on a particular person depends upon the susceptibility to injury of the plaintiff. In other words, the fact that the injury would have been less serious if inflicted upon another person should not affect the amount of damages to which the plaintiff may be entitled.

The trial judge refused to give that instruction.

The case was submitted to the jury on special issues, the first of which read as follows:

Do you find that the defendant, Nora L. de Lara, M.D., was negligent in her care and treatment of Linda Wrobleski?

The jury answered that first question in the negative, and Ms. Wrobleski noted this timely appeal.

---

**3.** The trial judge did not force the doctor to answer the question even though the question or one similar to it was asked a total of three times. On appeal, an appellant, in a civil case, is required to prove not only error but also that he/she was prejudiced by the error. *Bradley v. Hazard Tech. Co.*, 340 Md. 202, 206, 665 A.2d 1050 (1995). Appellant claims it was error to allow the expert to be questioned in regard to past recompense for services as an expert and that she was prejudiced by the "error" because the expert's failure to answer the question made it look as if the expert was hiding something sinister.

## II. QUESTIONS PRESENTED

1. Did the trial court err in allowing defense counsel to ask Ms. Wrobleski's expert witness, Dr. Lilling, how much money he earned in 1995 as an expert in medical malpractice cases?

2. Did the trial court err in refusing to propound defense counsel's requested instruction regarding a plaintiff's susceptibility to injury?

## III. DISCUSSION

### A. Issue 1

■ Appellant relies exclusively upon the case of *Mohn v. Hahnemann Medical College and Hospital,* 357 Pa.Super. 173, 515 A.2d 920 (1986), in support of her contention that it was reversible error for the trial judge to allow Dr. Lilling to be interrogated as to the amount of income he earned in 1995 in his capacity as an expert witness. In *Mohn,* the defense called as an expert a Dr. Urbach. On cross-examination, plaintiff's counsel asked Dr. Urbach what he had earned testifying as an expert in the past five years. Counsel for the defendant objected to this question, but the objection was overruled. Plaintiff's counsel proceeded to establish that between 1979 and the date of trial, Dr. Urbach's annual earning for his work as an expert ranged between $54,652 and $124,-507. The Pennsylvania Superior Court reversed, saying:

> [U]nder the facts of this case, the nexus between Dr. Urbach's compensation for *all* services rendered (which included work for private and governmental agencies, patients and other law firms) from 1979 to 1983, *exclusive of those received for work performed for defense counsel's law firm,* and his credibility on the witness stand is tenuous at best.

*Mohn,* 515 A.2d at 925.

In reaching its conclusion that the error entitled the defendant to a new trial, the *Mohn* Court observed:

It is true, as made mention of in the trial court's opinion to us, that Dr. Urbach should be required to "lift his visor so that the jury could see who he was, what he represented, and what interest, if any, he had in the *results of the trial,* so that the jury could appraise his credibility." *Goodis v. Gimbel Brothers,* 420 Pa. 439, 445, 218 A.2d 574, 577 (1966) (Musmanno, J.) (Emphasis added.) However, we do not think this encompasses the emptying of one's pockets and turning them inside out so that one's financial worth can be open to scrutiny.

*Mohn,* 515 A.2d at 924.

The *Mohn* decision was based, in large part, on the authority of a Pennsylvania Supreme Court decision in the case of *Zamsky v. Public Parking Authority of Pittsburgh,* 378 Pa. 38, 105 A.2d 335 (1954). *Zamsky* involved a property condemnation case in which tenants of the condemned property sought compensation for the public taking. A judgment in favor of the tenants was reversed by Pennsylvania's highest court because the trial judge allowed the government's expert to be cross-examined concerning fees received over more than a five-year period for "services rendered" to the condemnor in its acquisition of numerous other pieces of property.

The *Zamsky* Court concluded:

Thus the plaintiffs got before the jury that for services not rendered on the trial of this case (except in part) the firm of the expert witness had been paid $17,866.32, and in the future expected to receive $7,500 to $8,100. Thus error was thrice compounded, as we have said, and in addition consisted in admitting what the witness earned, not as an expert witness, but for general services to the Authority. This examination was clearly prejudicial error which must have contributed to the large verdicts for the plaintiffs.

It is entirely proper to inquire of an expert witness what his fees are for testifying in the case on trial. *Commonwealth v. Simmons,* 361 Pa. 391, 403, 65 A.2d 353; *Grutski v. Kline,* 352 Pa. 401, 404, 43 A.2d 142; *Reed v. Philadelphia Transit [Transportation] Co.,* 171 Pa.Super. 60, 62, 90

A.2d 371, 33 A.L.R.2d 1166. But none of the reported cases go to the length that was permitted here, and in overruling the appellant's objection the court abused its discretion. The earnings of the expert witness from other services performed for the defendant were a purely collateral matter and the testimony thereon was not admissible to affect his credibility.[4]

*Zamsky,* 105 A.2d at 336.

More recently, in the case of *Tiburzio–Kelly v. Montgomery,* 452 Pa.Super. 158, 681 A.2d 757 (1996), the Pennsylvania Superior Court observed that *"Mohn* . . . did not announce a *per se* rule." *Id.* 681 A.2d at 769. In the *Tiburzio–Kelly* case, plaintiff's expert testified that he did not personally profit from any money or revenue that was generated for his time in assisting litigants and their attorneys with respect to medical malpractice cases. He testified that all money earned in that regard went to a non-profit neighborhood health center that cared for indigents. On cross-examination, defense counsel was allowed to bring out the fact that in 1990, the year that he rendered at least some services for plaintiff, he had received over $100,000 as recompense for his services as an expert. The *Tiburzio–Kelly* Court ruled that it was proper to allow the defense attorney to show that the expert's altruism was of relatively recent origin.

Other state and federal courts have ruled similarly to the *Mohn* Court and have upheld the refusal of trial courts to admit evidence of a specific amount of compensation earned by experts in previous cases. *See, e.g., Weaver v. Georgia Power Co.,* 134 Ga.App. 696, 215 S.E.2d 503 (1975) (holding trial court did not err in sustaining objection to question regarding expert's fees for parties other than condemnor); *State By and*

---

4. It is worth noting that the Maryland Court of Appeals has taken a view contrary to that of the *Zamsky* Court. In *Scott v. State,* 310 Md. 277, 294, 529 A.2d 340 (1987), the Court said: "Evidence tending to show that an expert witness has frequently testified or otherwise been involved in litigation for one party directly relates to the weight a jury may give the testimony." Thus, in Maryland, it would not have been reversible error to admit the evidence that led to the reversal in *Zamsky.*

*Through State Highway Comm'n v. Superbilt Mfg. Co.*, 204 Or. 393, 281 P.2d 707 (1955) (same); *cf. United States v. 412.93 Acres of Land*, 455 F.2d 1242, 1247 (3d Cir.1972) (holding trial court did not abuse its discretion in refusing to allow government to cross-examine landowner's expert in regard to other fees earned in appraising properties for the appellee-landowner other than the condemned land).

The majority of other courts, however, have upheld the right of a trial judge to allow opposing counsel to ask an expert witness on cross-examination about the specific amount of compensation he/she earned from testifying in previous cases. *See Collins v. Wayne Corp.*, 621 F.2d 777 (5th Cir. 1980); *Trower v. Jones*, 121 Ill.2d 211, 117 Ill.Dec. 136, 140, 520 N.E.2d 297, 301 (1988); *Sears v. Rutishauser*, 102 Ill.2d 402, 80 Ill.Dec. 758, 466 N.E.2d 210 (1984); *City of Chicago v. Van Schaack Bros. Chem. Works*, 330 Ill. 264, 161 N.E. 486 (1928); *Kerfoot v. City of Chicago*, 195 Ill. 229, 63 N.E. 101 (1902); *Zeller v. American Safety Razor Corp.*, 15 Mass.App. Ct. 919, 443 N.E.2d 1349 (1983); *State v. Love*, 963 S.W.2d 236 (Mo.Ct.App.1997); *Board of Public Bldgs. v. GMT Corp.*, 580 S.W.2d 519 (Mo.Ct.App.1979); *Barrios v. Davis*, 415 S.W.2d 714 (Tex.Civ.App.1967); *see also* Comment, *Experts: Witnesses for the Persecution? Establishing an Expert Witness's Bias Through the Discovery and Admission of Financial Records*, 63 UMKC L.Rev. 133, 150–54 (1994); Russell G. Donaldson, Annotation, *Propriety of Cross–Examining Expert Witness Regarding His Status as "Professional Witness,"* 39 A.L.R.4th 742, 758–63 (1985, 1997 Supp.) (and cases collected therein).

 Although we have found no Maryland case directly on point, it is appropriate to note that it is a long-settled principle of Maryland law that on appellate review trial judges are traditionally afforded great deference when exercising their discretion to admit or refuse expert testimony. *Scott v. State*, 310 Md. 277, 293, 529 A.2d 340 (1987). Moreover, in Maryland, a trial judge is granted broad discretion in determining the extent and scope of cross-examination and his/her

exercise of discretion in this regard will not be reversed absent clear abuse. *Johnson v. State*, 303 Md. 487, 516, 495 A.2d 1 (1985), *cert. denied*, 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986); *see also Mezzanotte Constr. Co. v. Gibons*, 219 Md. 178, 181, 148 A.2d 399 (1959) ("It is well settled that the compensation of an expert witness is a proper subject for cross-examination"); *Ager v. Baltimore Transit Co.*, 213 Md. 414, 427–28, 132 A.2d 469 (1957) (holding trial court did not err in allowing defense attorney to inquire of plaintiff's medical expert as to how many times he had examined persons referred to him by plaintiff's counsel).

In recent years the courts in Maryland and elsewhere have experienced the phenomenon of the "professional expert" whose opinions are ofttimes shaded in favor of the party who pays his or her fee. *See generally* Michael H. Graham, *Impeaching the Professional Expert Witness by Showing a Financial Interest*, 53 Ind. L.J. 35 (1977). With the existence of locator services, a resourceful attorney can contact an expert to testify on nearly any subject that calls for the opinion of an expert. Seemingly, an "expert" can be found to testify to virtually anything.[5] In Maryland, as in most other parts of the country, if an attorney needs an expert medical witness to state that the plaintiff suffered a whiplash injury caused by a rear-end collision, call Dr. A; if the defense needs a medical expert to dispute that fact, call Dr. B. As the late Melvin Belli, the self-proclaimed "King of Torts," once said, "If I got myself an impartial witness, I'd think I was wasting my money." *See* Peter W. Huber, *Galileo's Revenge: Junk Science in the Courtroom* 18 (1991). Although many expert witnesses may be biased in favor of the party that calls them, the biases of seasoned and well-educated experts often are difficult to demonstrate. In the words of Professor Graham:

---

5. For example, United States Supreme Court Justice Stephen Breyer recently related a story of an instance in which a court, based on bogus scientific evidence, held that dropping a can of orange juice caused breast cancer. Justice Stephen G. Bryer, "The Interdependence of Science and Law," Address to the American Association for the Advancement of Science (Feb. 16, 1998).

In combating testimony of the expert witness, opposing counsel must rely upon his skill in probing at weaknesses in the basis and reasoning of the witness whether or not disclosed upon direct, without letting the witness reinforce his direct testimony in the process. He must do this with an expert witness more familiar with the subject matter. Of course, counsel also has available the use of learned treatises to assist him in fencing with the witness. Unfortunately fencing with the witness is the impression the cross-examination of an expert witness often leaves with the jury, an impression trial counsel would prefer to avoid. The difficulty in conducting a successful destructive cross-examination is compounded by the growing number of experts whose livelihood is dependent in large part upon the litigation process. Such experts with their vast amount of litigation experience become exceptionally proficient in the art of expert witness advocacy.

Graham, *supra*, at 40.

One way of effectively combating the testimony of a professional expert (or for that matter any expert) is to show that the witness is biased. Like most business persons, many expert witnesses strive to keep their customers happy, especially if they have been well-compensated for their previous services. Accordingly, if an expert has made a large amount of money in the past testifying in legal proceedings, a jury might legitimately infer that the expert would want the flow of income to continue by testifying in a way that will produce a satisfied customer—thus increasing the likelihood that his old customers and future ones will continue to seek his services. Such an inference, of course, is not mandatory. This view was aptly expressed by the Illinois Supreme Court in *Trower v. Jones*, 117 Ill.Dec. at 139, 520 N.E.2d at 300:

[W]e reach our decision based on an appreciation of the fact that the financial advantage which accrues to an expert witness in a particular case can extend beyond the remuneration he receives for testifying in that case. A favorable verdict may well help him establish a "track record" which, to a professional witness, can be all-important in determin-

ing not only the frequency with which he is asked to testify but also the price which he can demand for such testimony. We find pertinent the following commentary from a recent annotation:

"That an expert in a particular field may be in effect a 'professional witness' in lawsuits, rather than being more or less exclusively a practitioner whose employment in a lawsuit as a witness is merely incidental to his or her profession, is a matter which is likely to bear on the credibility of that expert, since a significant portion of the expert's livelihood may thus depend on his or her desirability as a favorable and convincing witness, thus possibly leading to a temptation for the witness to color findings and testimony to suit the needs of the proponent party, rather than to evaluate and present the subject matter of the testimony with complete impartiality." (39 A.L.R.4th 742, 746 (1985).)

We thus find that it was proper to inquire how much Dr. Martins was earning annually from services relating to rendering expert testimony, and we find no impropriety in inquiring into such income for the two years immediately preceding trial.

The Fifth Circuit Court of Appeals expressed similar sentiments in *Collins v. Wayne Corp.*, 621 F.2d at 784, when it held:

A pecuniary interest in the outcome of a case may, of course, bias a witness. [McCormick on Evidence § 33 (1972)]. A showing of a pattern of compensation in past cases raises an inference of the possibility that the witness has slanted his testimony in those cases so he would be hired to testify in future cases. The trial court did not err in allowing Wayne to cross-examine Severy [plaintiff's expert] about compensation he had received for Volkswagen [a Company for whom the expert had previously testified].

We adopt the views expressed in *Trower* and *Collins* and hold that the trial judge did not abuse his discretion in allowing defense counsel to inquire as to the amount Dr.

Lilling had earned in 1995 as an expert. Here, there was good reason to suspect that the amount might be substantial, given that Dr. Tilling had testified as an expert in numerous jurisdictions far removed from his home state of New York, and he had been paid, in 1995 alone, $27,000 by appellant's counsel.[6]

## B. Issue 2

 Appellant contends that the trial judge committed reversible error by failing to give *Maryland Civil Pattern Jury Instruction* 10:3—susceptibility to injury. This issue will not detain us long. First of all, Pattern Instruction 10:3 concerns damages. The jury never reached the damage issue. So even if the failure to instruct was error, it was harmless. In any event, the trial court clearly did not err in failing to give the instruction. The susceptibility to injury instruction is applicable only to cases in which the injury suffered as a result of the purported negligence of a defendant is greater than it would have been if the plaintiff had been stronger or healthier. For example, if a hemophiliac is cut by flying glass in an automobile collision and his blood does not clot properly, causing serious injury, it is no excuse for the defendant to say that a person with normal blood would not have suffered as greatly. But in the case at hand, there was no evidence presented and no argument advanced that the injuries Ms. Wrobleski suffered as a result of the bowel perforation were any greater than the injuries that anyone else would have sustained if his or her bowel had been perforated. Ms. Wrobleski's argument that she was entitled to the instruction

---

**6.** Nothing in this opinion should be read as *requiring* a trial judge to allow a question of an expert merely because the cross-examiner phrased the question in the same manner as the question asked of Dr. Lilling. For instance, in cases in which the expert frequently has testified for both plaintiffs and defendants, the trial court could, at his/her option, elect to require the question to be divided, e.g., (1) "How much did you earn in 1995 for providing expert services to lawyers representing plaintiffs in medical malpractice actions?"; and (2) "How much did you earn in 1995 for providing expert services to lawyers representing defendants in medical malpractice actions?"

because the evidence showed that the bowel perforation was more likely to occur in her case because of her pre-existing condition of adhesions in her abdomen from prior surgeries misses the point because it was undisputed that the pre-existing adhesions had no impact on the extent of the damages caused by the alleged negligence of Dr. de Lara.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**